Argued and submitted January 30, 2006, affirmed January 31, petition for review denied April 24, 2007 (342 Or 645)

STATE OF OREGON,
*Respondent,*

*v.*

DONTAE REMARCUS FARMER,
*Appellant.*

010231271; A118013

152 P3d 904

Andrew S. Chilton argued the cause for appellant. With him on the brief was Chilton, Ebbett & Rohr, LLC.

Jennifer S. Lloyd, Assistant Attorney General, argued the cause for respondent. On the brief were Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and David J. Amesbury, Assistant Attorney General.

Before Landau, Presiding Judge, and Schuman and Ortega, Judges.

ORTEGA, J.

## ORTEGA, J.

Defendant was convicted of murder with a firearm. ORS 163.115. He appeals after the trial court denied his motion for a new trial based on newly discovered evidence, namely, testimony of an eyewitness who called 9-1-1 at the time of the shooting. ORS 136.535; ORCP 64 B(4). We affirm.

We begin with a brief overview of the evidence, before turning to a more detailed review. As the victim, Monterroso, was walking down the street one evening in late January 2001, he was killed by a single gunshot to the chest. At trial, the evidence against defendant included the following testimony: a witness identified defendant as someone who had been looking for Monterroso shortly before the shooting; another witness identified defendant as the person who shot Monterroso; and defendant's ex-girlfriend and her parents testified that defendant confessed to the killing, although they did not initially believe his confession. No physical evidence tied defendant to the murder. Defendant sought to undermine the certainty of the identification testimony, questioned the motives of his ex-girlfriend and her parents, and introduced evidence that the police had information that another person, who resembled defendant, was seen near the crime scene and was reputed to have been involved in the killing.

The newly discovered evidence at issue on appeal is a statement of an eyewitness, Thompson, who had called 9-1-1 at the time of the shooting but who could not be located in time for trial. In an affidavit, Thompson stated that defendant was not the shooter and that the shooter more closely resembled the person who defendant suggested was the killer. In response, the state submitted an affidavit from a police officer who subsequently interviewed Thompson and reported that Thompson expressed substantial uncertainty about her memory of events.

With that overview in mind, we turn to a more detailed examination of the evidence, beginning with the trial testimony of the two witnesses who identified defendant at trial: Monterroso's cousin, Feliu, and his friend, Muldrew. On the afternoon of January 24, 2001, Monterroso, who lived

with Feliu's family, was hanging out on the porch of their home with Feliu, Muldrew, and another friend, McCauley, when Feliu and Muldrew noticed two men walk by on the other side of the street. Perhaps around 4:30 p.m., Monterroso, Muldrew, and McCauley left Feliu behind and walked to a nearby store, with the intention of going to another friend's house afterward.

After they left, two men came to Feliu's door and asked where Monterroso was. The time was earlier than 5:00 p.m. and may have been around 4:45 p.m. (Feliu acknowledged that she was "really bad with times" but based her estimates on how light it was and on the time that her mother typically returned home from work.) Feliu testified that, because of the way the men were dressed, she recognized them as the same men who had walked by earlier. She also recognized one of the men as defendant, with whom she had attended middle school about four years earlier and whom she had seen outside of school a couple of times around the neighborhood. Feliu testified that she "knew him the second [she saw] him" that second time.

Feliu told the men that Monterroso and his friends had gone to the store, and the two men walked off in that direction. Perhaps 10 to 25 minutes later, shortly before 5:30 p.m., the two men returned, told Feliu that Monterroso was not at the store, and sat down on the porch. When Feliu told them that they could not remain there, the men left, although Feliu did not see what direction they went.

Muldrew testified that when he, Monterroso, and McCauley left the store, he saw defendant and another person standing in front of the store. He was not sure that it was defendant who had earlier walked by Feliu's house, but he did recognize defendant's companion, by his coat, as one of the men who had walked by while Muldrew and the others were on Feliu's porch.

Muldrew and Monterroso walked down the street next to each other, while McCauley walked farther ahead. Someone came up behind Muldrew and Monterroso and said, "Give us your money." Muldrew testified that someone then grabbed Monterroso and turned him around; when Muldrew

turned with Monterroso, he saw defendant shoot Monterroso in the chest from approximately three feet away with a .357 revolver. Muldrew ran to a payphone at the store and called 9-1-1, returned to where Monterroso was lying on the ground, determined that he was dead, and then ran to Feliu's house with McCauley. Records from the 9-1-1 call indicate that Muldrew called at 6:15 p.m.

Around the same time that Muldrew called 9-1-1, a woman—who at that time was identified only by her first name—also called 9-1-1. The 9-1-1 call went as follows:

"[Operator]   9-1-1. Do you need police, fire, or medical?

"[Caller]   Yes, someone just got shot on northeast 8th and Dekum.

"[Operator]   Okay. Do you know who did this?

"[Caller]   No, I don't know. They were running up the street. We need an ambulance right now.

"[Operator]   Okay.

"[Caller]   Right now.

"[Operator]   Do you know who—where the patient is?

"[Caller]   He's laying on the ground. I think he's—I think he's dead. I don't know.

"[Operator]   Okay.

"[Caller]   He's not moving.

"[Operator]   The guy who shot him, where'd he go?

"[Caller]   They ran up north, um, um, they just ran up the street.

"[Operator]   Northbound on 8th Avenue?

"[Caller]   Northeast 8th and Dekum.

"[Operator]   Number 8th. The guy with the gun—was he white, black, Hispanic?

"[Caller]   I think they were, um, Hispanic. I don't know. When I drove by, they had just shot him, and then they ran.

"[Operator]   Okay. The guy with the gun, you think he's Hispanic? How old do you think he was?

"[Caller]   Um, I think they were like—

"[Operator]   The one with the gun. Concentrate on the one with the gun.

"[Caller]   Teenagers.

"[Operator]   Okay. What was he wearing?

"[Caller]   I think one had on a baby-blue shirt and a jacket.

"[Operator]   What color jacket?

"[Caller]   Um, black, I think.

"[Operator]   Okay. And was he the one with the gun?

"[Caller]   Um, no.

"[Operator]   How many were in the group?

"[Caller]   Um, two.

"[Operator]   The other guy, what was he wearing?

"[Caller]   The other guy was wearing a jacket also.

"[Operator]   What color?

"[Caller]   I think blue.

"[Operator]   Okay, the first guy was wearing a black jacket. The second one a blue jacket, right?

"[Caller]   Yes, it's dark outside, so I'm not sure. But I know the guy is laying down on the ground, and he needs an ambulance—

"[Operator]   Okay, we've already got help on the way over there. Can you tell me more about the guy with the gun? Did you see what kind of a gun it was?

"[Caller]   No, when I pulled up, they ran.

"[Operator]   Okay.

"[Caller]   They had just shot him.

"[Operator]   Okay.

"[Caller]   [Unintelligible], I'm parking. They leaving him.

"[Operator]   Okay, the first guy, you think he's a teenager? How tall do you think he is?

"[Caller]   Huh?

"[Operator]   The first guy. He's a teenager?

"[Caller]   He's a teenager.

"[Operator]   How tall do you think he is?

"[Caller]   Probably like five feet.

"[Operator]   Okay. And how heavy?

"[Caller]   Probably, um, like 120 pounds.

"[Operator]   Okay. Any kind of fancy hair-do or hat?

"[Caller]   No.

"[Operator]   Okay. Any kind of facial hair?

"[Caller]   It's dark. I don't know.

"[Operator]   Okay. I know.

"[Caller]   It's dark outside.

"[Operator]   Did you see any moustache or any glasses or anything?

"[Caller]   No, I didn't see nothing.

"[Operator]   And you think he was wearing a blue shirt and a jacket?

"[Caller]   Yeah. I know he had on a jacket and a shirt.

"[Operator]   And it was a black jacket, right?

"[Caller]   A black or blue. Whatever.

"[Operator]   Okay. Okay. And the other kid, he's also Hispanic. And he's how tall?

"[Caller]   They're—he has friends. He was walking with friends.

"[Operator]   You said there were two of them.

"[Caller]   The guys that shot him, yeah. But the, the victim—

"[Operator]   But I'm talking about the bad guys. The guy— the guys who did the shooting. Okay. The second guy, how tall was he?

"[Caller]   I don't know. I don't know.

"[Operator]   Do you think he was taller than the first guy?

"[Caller]   Yeah, probably.

"[Operator]   Okay. And do you—was he short, fat, chubby, stocky?

"[Caller]   Skinny probably.

[Some conversation took place in the background; it is largely unintelligible.]

"[Operator]   Did he have any kind of a hat on or anything?

"[Caller]   I don't know.

"[Operator]   Okay, and you say he had a blue jacket on?

"[Caller]   Yeah.

"[Operator]   Okay. Can I have your name please?

"[Caller]   Lakeisha.

"[Operator]   How do you spell that?

"[Caller]   I'm talking to the lady!

"[Operator]   How do you spell that, ma'am?"

At this point, the telephone call ended.

On the night of the shooting, police did a "walk-through" of the crime scene, in which a number of detectives searched the area around the body for any evidence. They found no shell casings. An autopsy of Monterroso showed that the gun was probably fired from a distance of no more than 18 to 24 inches from his chest and that he was killed by the gunshot. Investigation of the fatal bullet could not conclusively establish the type of gun used as the murder weapon; the bullet could have been fired from a .357, a .38, a Rohm .38 special, or certain other types of guns.

Later that same night, Muldrew talked to police detectives and described what he had seen. He told police that the perpetrator was about 5' 9" or 5' 10", 16 to 19 years old, skinny, with a mustache and a goatee; he also indicated that the perpetrator was wearing a dark, puffy coat with writing above the breast area, similar to a "First Down" coat, and black sweatpants with a white stripe down the side.

Although Muldrew had seen defendant a couple of times previously and knew who defendant was (though only by a nickname), he did not identify defendant as the perpetrator at that time. He explained at trial that, on the night of the shooting, he "was still in shock" and "didn't tell nobody."

Feliu also spoke with police that night and provided this physical description of one of the two men who had been looking for Monterroso earlier in the evening: a black male, 18 years old, medium-dark complected, 5' 9" or 5' 10", with light facial hair, and wearing a blue coat with a hood and a horizontal stripe.[1] She told the police that she recognized the person as someone with the first name Dontae (defendant's name), with whom she had gone to middle school. She looked for a photo of the person she remembered in her school yearbook but could not find one.

Using the information from Feliu, Detective Renna, the lead homicide investigator on the case, identified defendant in a Portland Police Department computer system and found a picture of him from three years earlier. Two days after the murder, Renna showed Feliu a "photo throw-down" with six pictures, including a picture of defendant. Feliu readily identified defendant as one of the men who had been looking for Monterroso.

Two days after that, Muldrew and Feliu discussed the murder, "trying to think of why it happened." Identifying defendant by his nickname, Muldrew told Feliu that defendant had killed Monterroso. About two weeks after that conversation, Muldrew identified defendant in a police photo throw-down. At that time, he learned defendant's real name. Renna testified that neither Muldrew nor Feliu showed any hesitation in identifying defendant in the photo throw-downs.

---

[1] That same night, Feliu reported to police that the other man who had been looking for Monterroso was black, with a lighter complexion than the first man, 18 or 19 years old, about three inches taller than the first man (whom she described as about 5' 9'"), with a medium build that was a little bit heavier than his companion's, and wearing a blue coat with a hood. Muldrew described the second man as black, with a light complexion, 16 to 19 years old, about 5' 9'dp, with a medium build, and wearing a gray and blue windbreaker with a hood. Police were not able to obtain additional information about the second man.

Defendant offered evidence calling into question the identification evidence involving Feliu and Muldrew. Bolain, a friend of defendant, testified that defendant was with her and her family at her house, which is about eight blocks from the store where the victim and his friends went, until 5:00 p.m. on the day of the shooting. (As noted, Feliu indicated that the person she identified as defendant knocked on her door before 5:00 p.m., perhaps around 4:45 p.m., and that he and his friend had walked by once before that.) Bolain also stated that defendant had heavier than usual facial hair and unkempt braids that day and that she remembered thinking that "he needed to shave and get his hair done." (As noted, Feliu described the man she saw as having light facial hair.) Bolain identified a photo of blue sweatpants, with no stripe, as the pants that defendant was wearing that night, and other witnesses corroborated that, for a period including the day of the shooting, defendant did not have access to most of his clothes and that the blue sweatpants were his only pants. (As noted, Muldrew asserted that the perpetrator was wearing black sweatpants with a white stripe.) In addition, defendant introduced pictures of his coat, which had no stripe and no writing on it, contrary to Feliu's and Muldrew's descriptions. Defendant, who is black, also emphasized that the then-unidentified 9-1-1 caller (the same caller whose affidavit is the new evidence at issue) had stated that the shooter was Hispanic and that the police had received another report that a Hispanic male had been seen running from the scene of the shooting.

In addition to the identification evidence discussed above, the state offered evidence that defendant had confessed to his then-girlfriend, Jennifer; her mother, Perkins; and her father, Garvin. Defendant and Jennifer had started dating six or seven months before the murder, and defendant had stayed with Jennifer and Perkins during a period when he had no other home. Garvin did not live with Jennifer and Perkins. About two weeks before the shooting, defendant had engaged in an incident of violence against Jennifer—who, because of health problems and recent brain surgery, was so vulnerable that being hit could have killed her—and, as a result, Perkins no longer allowed him in their home. Garvin

had opposed defendant living with Jennifer and Perkins, in any event.

On the night of the shooting, defendant arrived at the home of Jennifer and Perkins looking scared and "spooked, like he [had] seen a ghost." When Perkins asked what was wrong, he said that "he saw his home boy get shot" and that he was only a few feet away when the shooter's car drove up. Later that night, Perkins heard on the news that no car had been involved in the shooting, but she "left it at that." Contrary to defendant's suggestion that he had seen the death of a friend, Feliu testified that she had never seen defendant and Monterroso spend time together before nor had she ever heard Monterroso mention defendant.

Jennifer testified that defendant told her that night that he had just killed someone and threatened to kill her if she ever told anyone. She did not tell anyone about the threat until a week before trial, because she did not want her mother to worry. Jennifer also stated that, perhaps the night after the murder, defendant told her that he had been threatened and that he had to kill the victim before the victim killed him; she did not initially tell detectives about that version of events.

Feeling sorry for defendant, who appeared to have just lost a friend, Perkins again allowed him to stay at her home. She thought that defendant and Jennifer, at that time, appeared to be getting along again. Jennifer testified that, for a period after the shooting, she and defendant were together all the time, and she put any fears about him "in the back of [her] mind[.]"

About a week and a half after the shooting, Garvin learned about defendant's earlier violence against Jennifer and wanted to talk to him about it. Garvin was angry and felt that defendant "had to go," and Perkins was worried about what Garvin might do to defendant. When Garvin informed defendant that he could not be around Jennifer, defendant abruptly asked if he could tell Perkins and Garvin something, and then confessed to the shooting on January 24. Perkins testified that defendant said the killing was over a

"weed deal * * * that went bad." Garvin testified that defendant appeared very upset and said that "it was either him or the other guy * * *."

Perkins was shocked at defendant's confession. She did not think that his story made sense, and she told him as much. According to Perkins, none of them discussed the shooting further that night and that was all she heard from defendant about it. Garvin, however, testified that defendant also described the killing, saying that he walked up to the victim, who did not see him coming, and shot the victim once with a .357 that defendant had gotten from a friend. Garvin stated that defendant said that he put the gun to the victim's head with the intention of scaring the victim and the gun "just went off. That's what he told me, he put the gun up to the guy's head and the gun went off." Garvin asked defendant what he was wearing at the time, and defendant said that he was wearing a reversible blue/black coat. Garvin had read about the murder in the newspaper before defendant's confession, but he had not read what kind of gun was used or how many shots were involved.

Neither Perkins nor Garvin believed defendant's story. Perkins believed that defendant was "puffing" because he feared Garvin and was trying to avoid being excluded from the home. Garvin thought the story about the marijuana deal was "gibberish" and just "talk," and, like Perkins, believed that defendant was telling a story to keep Garvin from kicking him out. However, out of concern for his daughter, Garvin also wanted to investigate the story.

The day after defendant's conversation with Garvin and Perkins, Garvin saw defendant and Jennifer getting on a bus together to go to school. Furious, Garvin got on the bus, rode with them to school, and within an hour called Renna, the homicide detective, about defendant's confession. Garvin told Renna that defendant "walked up on the guy and blew him away."

At some point after Garvin spoke to the police, defendant confronted Garvin about "ratting him out." After that confrontation, Garvin testified, "I did look at it in a different light, yes. He was pretty nervous and real up-tight. So at that

point I saw that this was going somewhere." Garvin testified that he never spoke with Jennifer or Perkins about defendant's case, beyond asking if detectives had contacted them and telling Jennifer that, if she did not want to testify, she should "just plead the 5th."

Renna spoke to Perkins and Jennifer several days after Garvin made his report. Shortly thereafter, Jennifer ended her relationship with defendant, and, within a few days, he was arrested.

Police seized defendant's coat on the night that he was arrested. No gunshot residue was found on it, but gunshot residue is projected forward from the firearm and would not necessarily be expected to land on the person using the gun. Likewise, no blood was found on the coat, which appeared to be somewhat soiled and not new, but not all gunshot wounds cause blood to get on the person using the gun.

At trial, defendant offered the theory that the perpetrator actually was another person, Baines, who resembles defendant. Six days after the murder, Renna received information that someone in custody had reported that another person (whom police could not locate) claimed to have seen Baines on the night of the murder riding a bicycle away from the crime scene and that "word on the street" was that Baines was involved in the murder. Renna also received confirmation that Baines "was connected with" the area where the murder occurred.

There also was evidence that Baines may have had access to a gun of a type that could have been the murder weapon, although the gun may have been inoperable at the time of the murder. In February 2001, pursuant to a search warrant, a Rohm .38 special was taken from a house with which Baines and at least five other people were associated. However, police could not show that Baines knew of or had possession of any firearm found in the house, and, indeed, the gun did not belong to Baines. The gun owner testified that, at the time of the February 2001 search, she had had the gun for two or three months and that it did not work. A forensic scientist for the Oregon State Police testified that he examined the gun, determined that the firing pin was stuck, removed a

small metal burr that was trapping the firing pin, and then was able to test fire it. He could not determine when the gun had last been operable.

Renna interviewed Baines in October 2001 but did not include pictures of Baines in any photo throw-downs. Shortly before trial, a police investigator, for the first time, showed Feliu and Muldrew a photo of Baines, without stating who he was or that he was a possible suspect. Muldrew noted that Baines bore a "[s]light resemblance" to defendant. Feliu testified that she did not recognize Baines but that he "looked like [defendant] kind of," nevertheless adding that she was sure it was defendant, not the person in the photo, who had come to her house on the day of the murder looking for Monterroso. Neither Feliu nor Muldrew recognized Baines or had any idea who he was.

At trial, there was some confusion regarding identification of Baines by a photo other than the one shown to Feliu and Muldrew. The police investigator identified the police photo of Baines, taken in February 2001, indicating that she had obtained it shortly before trial. However, shown a different photo of Baines, she instead identified the photo as one of defendant, although later she said that she did not know who was in the photo. Renna likewise identified the February 2001 police photo as a photo of Baines, but shown a different photo, in which Baines's hair was braided, Renna said that he was not sure but that it "could be" Baines. The owner of the store near which the shooting occurred recognized defendant from a picture; although she did not know his name, she knew that she had seen him since he was a young boy. The store owner also identified two other photos— (1) the one that Renna identified as Baines and (2) the one that Renna said "could be" Baines and that the investigator initially identified as being defendant—as both being photos of the same person. The store owner testified that she was familiar with Baines, although she did not know his name, and that he had stopped by her store only the day before.

After the case went to the jury, the jurors asked for clarification about the definition of "reasonable doubt" and about when they should tell the judge that the jury was hung.

After 15 hours of deliberating, the jury found defendant guilty of murder with a firearm.

Shortly thereafter, the defense was finally able to locate the missing 9-1-1 caller, Thompson, and obtain an affidavit from her.[2] In her affidavit, Thompson stated that, on the night of the shooting, she drove past Monterroso and his friends. Her three-year-old daughter was in the car with her. She saw two people approach Monterroso, then saw a gunshot, and saw Monterroso fall. She immediately called 9-1-1 and stopped her car next to the market, where she saw the shooter and his companion run right past her. Thompson stated that she was shown the pictures used in the photo throw-down that Feliu and Muldrew used to identify defendant, as well as a picture of defendant alone, and that defendant "was definitely not the shooter or the other person" who was with the shooter. She further stated that she saw two pictures of Baines and that he "most closely resembles the person I refer to as the 'shooter[.]' "

Defendant then moved for a new trial on the basis of newly discovered evidence. The state opposed the motion and offered an affidavit from Renna, who interviewed Thompson about two weeks after she signed her affidavit. According to Renna, during the interview Thompson was much more equivocal about her ability to identify the perpetrator than she had been in her affidavit and expressed concern about having to testify in court. In Renna's account of the interview, Thompson reported that she had seen the shooting take place and that the shooter was wearing a long jacket, but that she had only seen a " 'glimpse of one face, * * * not anything [she] could pinpoint.' " Thompson stated that she had seen one person's eyes and the structure of his face and that the person whose face she had seen had a darker complexion than hers. However, she was not sure whether the person she had seen was the one in the long jacket (*i.e.*, the shooter) or his companion. She stated that one of the two men may have been

---

[2] On the first day of trial, a defense investigator tried to serve a subpoena to obtain testimony about the absence of information regarding the missing 9-1-1 caller and learned for the first time that there might be a record of the cellular telephone number that the caller had used. After obtaining the number, the investigator was able, with some work, to locate the witness on March 29, 2002, a week after defendant was sentenced.

wearing a beanie-type hat, although she might have seen the person's hair rather than a hat. She also indicated that, because she saw that the victim was Hispanic when she made the 9-1-1 call, she might have been confused in describing the suspects as Hispanic. When asked if she would recognize the men who ran past her, Thompson said that she would not.

■ The trial court denied defendant's motion for a new trial based on the newly discovered evidence and entered a judgment of conviction for murder with a firearm. On appeal, defendant argues that the trial court erred by denying his motion.

■■ When the trial court's ruling on a motion for a new trial is based on an interpretation of law, we review for errors of law. *State v. Skillstad*, 204 Or App 241, 245, 129 P3d 232 (2006). If the trial court made no predicate legal error, then we review its decision for an abuse of discretion. *State v. Acree*, 205 Or App 328, 330, 134 P3d 1069 (2006). The abuse of discretion standard "has no hard and fast meaning," but abuse of discretion may occur when a decision is not supported by reason and evidence or when a court fails to exercise its discretion or to consider all relevant circumstances in making its decision. *Liberty Northwest Ins. Corp. v. Jacobson*, 164 Or App 37, 45, 46, 988 P2d 442 (1999) (citing *Far West Landscaping v. Modern Merchandising*, 287 Or 653, 664, 601 P2d 1237 (1979) (further citations omitted)).

■■ The trial court is the finder of fact at a hearing on a motion for a new trial. *State v. Disorbo*, 54 Or App 877, 885, 636 P2d 986 (1981). To justify a new trial, newly discovered evidence

"must meet the following requirements:

"(1) It must be such as will probably change the result if a new trial is granted;

"(2) It must be such as, with reasonable diligence, could not have been discovered before or during the trial;

"(3) It must be such that it cannot, with reasonable diligence, be used during trial;

"(4) It must be material to an issue;

"(5)  It must not be merely cumulative;

"(6)  It must not be merely impeaching or contradicting of former evidence."

*State v. Arnold*, 320 Or 111, 120-21, 879 P2d 1272 (1994) (footnote omitted). The last three factors of that test are closely connected to the first factor. *See Newbern v. Exley Produce Express*, 208 Or 622, 632, 303 P2d 231 (1956) (principle that cumulative evidence does not justify a new trial is corollary of rule that new evidence must be such as would probably change the result); *State v. Clayton*, 11 Or App 534, 538, 504 P2d 139 (1972) (considering last three factors as being part of the requirement that the new evidence would probably change the result). Motions for new trial are disfavored. *Disorbo*, 54 Or App at 882.

Here, the focus is on the first, fifth, and sixth factors of the *Arnold* test. The trial court concluded that the defense had exercised reasonable diligence and thus satisfied the second and third factors, and the state does not challenge that the evidence was material, satisfying the fourth factor. The trial court denied defendant's motion based on its determination that the newly discovered evidence (Thompson's testimony) was merely impeachment (the sixth factor), that it was not "new evidence" (which we take to suggest that her testimony was cumulative of the 9-1-1 recording (the fifth factor)), and that it would not probably change the result of the trial (the first factor).

There are some areas of tension in the case law regarding motions for new trial. First, a number of opinions by this court and the Supreme Court refer to a requirement that new evidence "show[ ] a state of undisputed facts," but the meaning of that phrase is unclear. The phrase appears to have originated in *Watrous v. Salem Brewery Ass'n*, 151 Or 294, 49 P2d 375 (1935). There, the plaintiff had prevailed in a negligence claim against his employer after a workplace injury to his leg. At trial, he and a witness who claimed to be his wife testified about his lack of leg pain prior to the accident. After the plaintiff prevailed at trial, however, the defendant moved for a new trial, relying on the statement of a woman who claimed that *she* was the plaintiff's wife and, furthermore, that he had previously had leg pain. The court

noted that the new witness's statement, "although designated as an 'affidavit,' is not sworn to," but that the plaintiff had not moved against or denied the new witness's statement. 151 Or at 300. Reversing and remanding for a new trial, the court stated:

> "Each motion for a new trial on the ground of newly-discovered evidence must rest on its own particular facts and circumstances. And if the affidavit shows a state of undisputed facts that would probably lead the ordinarily reasonable person to a different conclusion than that arrived at by the jury, and the other necessary elements being present, the court should set the judgment aside and grant a new trial."

*Id.* at 302. Although obvious factual disputes existed between the new evidence and the evidence previously presented at trial, the court reversed for a new trial.

Despite the inconsistency between the apparent meaning of "undisputed facts" and the actual result in *Watrous*, Oregon courts have continued to refer to that phrase without clarifying it. For example, in *State of Oregon v. Davis*, 192 Or 575, 579, 235 P2d 761 (1951), the court cited *Watrous* and stated, "A court will not heed the application [for a new trial] unless the supporting affidavits show a state of undisputed facts which would probably lead an ordinarily reasonable person to a different conclusion from that arrived at by the jury, other necessary elements being present." The result in *Davis*, however, did not depend on whether the new evidence showed an undisputed state of facts; rather, a new trial was denied because the proffered evidence was cumulative and probably would not change the result. 192 Or at 580. Similar language has been repeated in later cases. *See Newbern*, 208 Or at 631 (quoting *Davis*); *Acree*, 205 Or App at 335 (quoting *Davis*); *McCathern v. Toyota Motor Corp.*, 160 Or App 201, 239, 985 P2d 804 (1999), *aff'd*, 332 Or 59, 23 P3d 320 (2001) (quoting *Davis*). If newly discovered evidence has to create an undisputed state of facts, it could almost never be grounds for a new trial: if it conflicted with the existing evidence, it would not be undisputed, but if it did *not* conflict with the existing evidence, it typically would be cumulative.

There also is tension in our case law regarding the extent to which the court determines whether new evidence would be believed by the jury. In some cases, we have determined that the new evidence is simply too unbelievable to change the result if a new trial were granted. *See, e.g., Disorbo*, 54 Or App at 884-85 (the new witness could not be believed because he had repeatedly lied to police and to the defendant's investigator); *State v. Williams*, 2 Or App 367, 468 P2d 909 (1970) (the new witness, a former cell mate of two other witnesses, would not be believable where he admitted committing perjury on four earlier occasions). In other cases, where the proffered newly discovered evidence could be believed by a reasonable jury and meets all of the other criteria, we have concluded that the result at trial would probably be different. In *State v. Toth*, 30 Or App 285, 566 P2d 1218 (1977), a witness testified at trial that the defendant and two other men had gone outside just before the defendant's car caught fire and that the defendant admitted having one of his companions set the fire.

The newly discovered evidence consisted of statements from the defendant's two companions that none of them had gone outside at the critical time and that they had earlier noticed that the car smelled of gasoline and had loose electrical wires. Reversing and remanding for a new trial, we noted that the defendant's conviction was "based predominantly on the testimony of a single witness. We agree with the defendant that if the newly discovered evidence is believed by a jury, the same 'will probably change the result.'" *Id.* at 290 (quoting *Davis*, 192 Or at 579); *see also State v. Kilpatrick*, 35 Or App 749, 755, 756, 582 P2d 480 (1978) ("[T]he sole real issue in the case is whether or not the testimony, if believed, would have been likely to change the result" and, where the new evidence created "a direct conflict in the testimony with respect to eyewitness identification," it was likely to change the result). That assessment necessarily is based not on a prediction that the jury will believe the evidence but rather on an assessment that the evidence could be believed by a reasonable jury and, if so, would probably change the result.

Although we acknowledge those areas of confusion in the case law, we need not resolve them in this case because,

under any interpretation of the *Arnold* test, we conclude that the trial court did not abuse its discretion in determining that Thompson's testimony would not probably change the result at trial.[3] That factor requires us to consider whether the new evidence "would probably lead a reasonable person to a different decision from that reached by the jury." *Acree*, 205 Or App at 337. Whether new eyewitness testimony would probably change the result depends on the circumstances of the particular case and the evidence in the record.

Here, the trial judge could conclude that Thompson's testimony would not be likely to change the result, in light of her statements to Renna expressing uncertainty regarding her ability to recognize the perpetrator. In her affidavit, Thompson stated definitely that defendant was not the shooter or the shooter's companion. That testimony alone might well have been enough to justify a new trial because, despite the possible impeaching factors of time and some inconsistencies between Thompson's statements during the 9-1-1 call and her affidavit testimony, a reasonable jury could believe Thompson's affidavit testimony. We note also that Thompson does not suffer from the inherent credibility problems noted in prior cases. *See, e.g., Disorbo*, 54 Or App at 884-85; *Williams*, 2 Or App at 372. However, the force of Thompson's affidavit testimony is significantly undercut by Renna's affidavit describing his second interview with Thompson. Defendant offered no evidence to dispute Renna's account of that interview, in which Thompson acknowledged that she had seen only a glimpse of one face and would not be able to recognize the person whom she had seen. Given

---

[3] The trial court's determination regarding the fifth and sixth factors of the *Arnold* test was, however, incorrect. As to the fifth factor, the new evidence was not cumulative. Although a recording of Thompson's 9-1-1 call was played for the jury, Thompson did not testify at defendant's trial, nor did any other witness testify that defendant was not the perpetrator.

As to the sixth factor, the new evidence likewise was not "merely impeaching." Impeachment evidence attacks the credibility of a witness. *See* OEC 607 - 610 (identifying kinds of impeachment evidence that may be admitted). Although Thompson's testimony contradicted Muldrew's testimony and could be seen as inconsistent with Thompson's own 9-1-1 call, her testimony also was relevant to the substantive matter of whether defendant shot Monterroso. *See Acree*, 205 Or App at 334 (evidence that would have directly rebutted the state's theory of the defendant's guilt was not merely impeaching, although it would contradict a witness's testimony).

Thompson's admitted uncertainty, it was within the trial judge's discretion to conclude that a reasonable jury could not believe her positive statement that defendant was not the shooter and that Thompson's testimony, therefore, would not probably change the result if a new trial were granted. Accordingly, the trial court did not err by denying defendant's motion for a new trial.

Defendant also argues that the trial court erred by not allowing defendant's trial counsel to mail a survey to potential jurors. We reject that argument without discussion.

Affirmed.