Argued and submitted March 13, affirmed November 5, 2008

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

DARRELL SKY WALKER,
*Defendant-Appellant.*

Lane County Circuit Court
200513599; A133118

196 P3d 562

──────────

Ted Vosk argued the cause for appellant. With him on the briefs was Timothy R. Gassner.

Janet A. Klapstein, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Wollheim, Presiding Judge, and Armstrong, Judge, and Sercombe, Judge.

WOLLHEIM, P. J.

## WOLLHEIM, P. J.

Defendant was tried by jury and convicted of manslaughter in the second degree, ORS 163.125, assault in the second degree, ORS 163.175, and assault in the fourth degree, ORS 163.160.[1] He appeals after the trial court denied his motion for a new trial based on newly discovered evidence, ORS 136.535; ORCP 64 B(4), advancing two assignments of error. We affirm.

Because we must evaluate the quantity and quality of the evidence against defendant to consider defendant's first assignment of error, we recite the facts in some detail. Defendant's convictions stem from a brawl in the early morning hours of June 10, 2005, in which Phillip Gillins was punched in the head. Gillins died two days later from injuries sustained in that brawl.

## I. THE TRIAL

The evidence at trial was that defendant and his friends, Ryan Joyce and Brian (J.D.) Beall, confronted Gillins, Anthony Boulis, and Jeremiah Crider in an alley near the University of Oregon campus. All six men had been celebrating the end of the school year and had been drinking throughout the night. Defendant is African-American and Joyce, Beall, Gillins, Boulis, and Crider are Caucasian.

The confrontation occurred after Joyce ran into defendant and Beall at a convenience store. Joyce told defendant and Beall that someone in a group of three men had just directed a racial epithet at Joyce while he was walking down the street. Defendant, Joyce, and Beall left the convenience store to look for the men who had insulted Joyce.

Defendant, Joyce, and Beall caught up with Gillins, Boulis, and Crider in an alley. Joyce confirmed that they were the same men who had insulted him earlier. Defendant demanded to know who had verbally insulted Joyce. Gillins stepped forward and said, "I did it," admitting that he had made the racial remark. By that time, defendant had taken "[his] shirt off, because [he] was angry." The confrontation

---

[1] Defendant does not challenge his conviction for assault in the fourth degree.

escalated into a physical altercation. During the brawl Gillins was struck in the head and fell to the ground, hitting his head on the concrete. Gillins died two days later.

The evidence at trial was that the only people in the alley during the fight were defendant, Gillins (the victim), Joyce, Beall, Boulis, and Crider. Accordingly, the only people who could have (1) witnessed the assault on Gillins; (2) identified the assailant; and (3) testified as to those matters at defendant's trial were defendant, Joyce, Beall, Boulis, and Crider. Of those individuals, Crider and Boulis were witnesses for the prosecution. Defendant was the only eyewitness to the fight to testify for the defense. Beall, who was called by the state, asserted his Fifth Amendment right against self-incrimination and did not testify. Joyce did not appear at trial because he could not be located by either the state or defendant.

A. *The Prosecution*

The state called Beall, Crider, and Boulis as witnesses. Crider testified that he was certain that defendant had hit Gillins:

"[PROSECUTOR]: And how sure are you today that it was the black guy with no shirt on who was the person who hit Phillip Gillins?

"[CRIDER]: A hundred percent.

"[PROSECUTOR]: Is there any doubt in your mind that it could have been any other person?

"[CRIDER]: No."

Boulis also testified that defendant struck Gillins:

"[PROSECUTOR]: And so the first hit that you remember is Phillip [Gillins]?

"[BOULIS]: Yep.

"[PROSECUTOR]: Did you see that punch?

"[BOULIS]: I did.

"[PROSECUTOR]: Did you see the defendant throw it?

"[BOULIS]: I did.

"* * * * *

"[PROSECUTOR]: From what you saw, is there any possible way that [Joyce or Beall] could have thrown a punch?

"[BOULIS]: No way.

"* * * * *

"[PROSECUTOR]: From where [Joyce and Beall] are standing * * *, is there any way that they could have hit Phillip?

"[BOULIS]: No, not without me seeing it. They could have. They were close enough to. But they didn't. And I didn't see it. And I was standing right there."

The state called four other witnesses. Each witness testified that they saw only one African-American man in the alley and that the African-American man was the only person who was not wearing a shirt. Additionally, the witnesses each testified that they did not see Gillins's assailant because they were not in the alley when Gillins was hit.

## B. *The Defense*

The defense theory was that Beall, not defendant, had hit and killed Gillins and, therefore, defendant was not guilty of either manslaughter in the second degree or assault in the second degree. During the three-day trial, six witnesses, including one of the state's witnesses, testified in accordance with defendant's theory of the case.

First, the state offered the testimony of Jessica Bloomfeldt. Bloomfeldt testified that she had arrived at the alley after Gillins was hit. She saw Beall standing in the alley, and Gillins—whom she did not know—lying on the ground. Bloomfeldt testified, "Yeah, I asked [Beall] what happened. And he proceeded to tell me that he [Beall] just knocked the guy out." Bloomfeldt also said that she saw defendant running after someone on the street near the alley.

Second, Carrie Evans testified that Beall had told her that he had punched Gillins. On cross-examination, Evans clarified that she first heard that Beall—and not defendant—had hit Gillins from defendant, and that it was not until later that she heard Beall say that he had hit

Gillins. Evans also testified that she did not tell the police that she had heard Beall admit to hitting Gillins. Evans knew both defendant and Beall; she was defendant's girl-friend and Beall's high school classmate.

Third, James Butler testified. Butler knew Beall from high school and was friends with both defendant and Beall. Butler testified that Beall had boasted that he (Beall) had "socked [Gillins] * * * and [that] he didn't get back up." On cross-examination, Butler stated that the reason he did not tell the police that Beall had admitted hitting Gillins was "to protect [his] friends[.]"

Fourth, Elliot Spear, defendant's roommate, testi-fied that he was asleep in his bedroom when he heard loud voices in the apartment at around 2:00 a.m. or 3:00 a.m., a few hours after the fight. Spear went to investigate and saw defendant, Beall, and some other people in the apartment. Spear asked the group to quiet down and he returned to his bedroom. Spear continued, "And later on, I heard [Beall]'s voice, which is very distinct * * * say that he had knocked out a kid out at the bar. * * * [Beall] was proud that he just had hit this kid and knocked him on his butt." When asked by defense counsel if he told the police about what he had heard, Spear replied, "No. I didn't tell them anything, actually." During cross-examination by the state, Spear admitted that, less than two weeks after Gillins died, he lied to police by say-ing that he was "shocked to learn that [defendant and Beall] were involved[,]" and that the reason he lied to the police was to protect his friends, defendant and Beall.

Fifth, Sydney Lighty testified and described a con-versation between herself and Beall that took place approxi-mately two weeks after Gillins died:

> "[T]here was a fight that happened at Taylor's [a bar near campus], actually outside of Taylor's. [Beall] said it started inside at the pool tables. Somebody made a racist remark to him and that—I didn't really get the details of how they got into the alley, but there was a fight. Somebody swung at [Beall]. [Beall] swung back. Landed a punch. The person fell. And then [Beall] told me that [Gillins] had died."

Later in her testimony, Lighty stated,

> "[Beall] pretty much told me that he wasn't sure whether or not he was going to be around for my birthday * * *. [My birthday] was five days from when he told me. And that he couldn't really go out with me. [Beall] didn't really want to hang out with me that much because he didn't want me to be involved if something happened, like if the police came after him or something. [Beall] was convinced he was going to jail. It was just a matter of time."

Lighty was friends with defendant's girlfriend, Evans, and Lighty had dated Beall off and on for approximately six years.

Sixth, and finally, defendant testified in his own behalf. Defendant admitted pushing Crider to the ground, but steadfastly denied that he had ever hit Gillins. Rather, he described how Beall had hit Gillins just as defendant pushed Crider to the ground:

> "[DEFENSE COUNSEL]: And tell us now exactly how [Beall]—did you actually see the punch being thrown by—

> "[DEFENDANT]: Yes.

> "[DEFENSE COUNSEL]: —[ ] Beall?

> "[DEFENDANT]: Definitely, because it happened exactly when [Gillins] goes, 'I did it.' And as soon as [Gillins] did that, [Beall] hit him. [Gillins] falls back after his hands go stiff like this, because I remember it exactly. His hands go stiff. He falls down. * * *"

## C. *The Jury*

After the case went to the jury, the jurors sent a note to the judge asking, "Ryan-where is Ryan Joyce?" In response, the trial court explained in a written answer, "Ryan Joyce was not a witness in this case, and you may not speculate about the reason for that, or what his testimony might have been." The jury returned guilty verdicts on all three counts on April 20, 2006.

## II. MOTION FOR A NEW TRIAL

Defendant was sentenced on May 9, 2006. The judgment of conviction was entered on May 17, 2006. Two days

later, defendant filed a motion for a new trial on two grounds: (1) newly discovered evidence pursuant to ORCP 64 B(4), and (2) misconduct of the prevailing party pursuant to ORCP 64 B(2).[2]

On June 8, 2006, the trial court held a hearing on defendant's motion. Joyce, who had not been subpoenaed for trial, had been located and subpoenaed for that hearing. He appeared and the trial court set over the hearing to allow Joyce to retain counsel. On June 16, defendant requested a continuance to file a petition for a writ of mandamus regarding the court's evidentiary ruling on Joyce's invocation of the privilege against self-incrimination. The court granted the continuance, and defendant filed the petition for a writ of mandamus with the Supreme Court. The Supreme Court denied the petition by order. The hearing on defendant's motion reconvened on June 30, 2006. At the end of the hearing, the trial court denied defendant's motion for a new trial. Defendant appeals.

## III. THE APPEAL

### A. *Standard of Review*

When the trial court's ruling on a motion for a new trial is based on an interpretation of law, we review for errors of law. *State v. Skillstad*, 204 Or App 241, 245, 129 P3d 232 (2006). If the trial court made no predicate legal error, then we review its decision for an abuse of discretion. *State v. Acree*, 205 Or App 328, 330, 134 P3d 1069 (2006). The trial court is the finder of fact at a hearing on a motion for a new trial. *State v. Disorbo*, 54 Or App 877, 885, 636 P2d 986 (1981).

---

[2] ORCP 64 B provides, in part:

"A former judgment may be set aside and a new trial granted in an action where there has been a trial by jury on the motion of the party aggrieved for any of the following causes materially affecting the substantial rights of such party:

"* * * * *

"(2) Misconduct of the jury or prevailing party.

"* * * * *

"(4) Newly discovered evidence, material for the party making the application, which such party could not with reasonable diligence have discovered and produced at the trial."

B. *The Assignments of Error*

Defendant asserts two assignments of error: first, that "[t]he trial court abused its discretion by not granting defendant's motion for a new trial"; and second, that the court erred when it accepted Joyce's blanket claim of privilege against self-incrimination while refusing to inquire into the basis for that claim or compelling Joyce's testimony in the hearing on the motion for a new trial. We address each in turn.

C. *Motion for New Trial: Newly Discovered Evidence*

■ ■ To justify a new trial, newly discovered evidence must meet the following requirements:

"(1) It must be such as will probably change the result if a new trial is granted;

"(2) It must be such as, with reasonable diligence, could not have been discovered before or during the trial;

"(3) It must be such that it cannot, with reasonable diligence, be used during trial;

"(4) It must be material to an issue;

"(5) It must not be merely cumulative;

"(6) It must not be merely impeaching or contradicting of former evidence."

*State v. Arnold*, 320 Or 111, 120-21, 879 P2d 1272 (1994) (footnote omitted). Motions for a new trial are disfavored. *Disorbo*, 54 Or App at 882.

We understand defendant's newly discovered evidence to consist of (1) Joyce's testimony and (2) Jordan Holliday's and Melissa Sayer's affidavits.[3]

---

[3] In his May 19, 2006, motion for a new trial, defendant's newly discovered evidence consisted solely of Holliday's expected testimony. By June 8, 2006, the date of the hearing on defendant's motion for a new trial, defendant had located and subpoenaed Joyce. On appeal, defendant relies on the expected testimony of both Holliday and Joyce, although, in defendant's reply brief, he states that "Ryan Joyce's testimony was the primary basis for the motion for new trial."

Defendant argues that Melissa Sayer's affidavit is relevant for two alternative reasons. First, because Joyce asserted his privilege against self-incrimination at the hearing on defendant's motion for a new trial, Sayer's affidavit is proof of the substance of Joyce's expected testimony. Second, in the event that Joyce's assertion

## 1. *Ryan Joyce*

As stated previously, Joyce did not testify at trial. Neither the state nor defendant could find him, despite the parties' reasonable efforts. After defendant's trial but before he was sentenced, defendant's private investigator, Yarbrough, found Joyce and tried to speak with him, but Joyce declined to speak with him. Yarbrough also told the police where he had found Joyce.

Pursuant to a subpoena, Joyce attended each hearing on defendant's motion for a new trial; each time, Joyce invoked his privilege against self-incrimination.[4] The trial court accepted Joyce's assertion of the privilege against self-incrimination.

Defendant offered affidavits from Jordan Holliday and Melissa Sayer, arguing that those affidavits provided the substance of Joyce's "expected testimony." Defendant explained that obtaining an affidavit from Joyce was impossible.

## 2. *Jordan Holliday*

Jordan Holliday was Joyce's roommate at the time of the fight. He was also friends with defendant, Joyce, and Beall. In his affidavit, Holliday recited what had happened in his apartment immediately after the brawl:

"I am familiar with the incident involving * * * Beall, * * * Joyce and [defendant] that occurred on 6-10-05. I was home watching T.V. About 2:40 a.m. [Joyce] and [Beall] arrived at my residence. Both were very loud, rowdy and very excited. [Beall] began talking loudly saying that he, [Joyce], and [defendant] had gotten into a fight with 3 other guys * * * [Beall] stated he confronted the three men * * * and when one guy stepped forward and raised his hand and as the guy started to say something [Beall] stated he punched the guy

of the privilege against self-incrimination is valid, Sayer's affidavit, defendant argues, would be admissible hearsay.

[4] At the June 16, 2006, hearing, Joyce's counsel clarified that the bases of Joyce's invocation were the Fifth Amendment to the United States Constitution and Article I, section 12, of the Oregon Constitution. The Fifth Amendment provides, in part, that "no person * * * shall be compelled in any criminal case to be a witness against himself[.]" Article I, section 12, provides, in part, that "[n]o person shall be * * * compelled in any criminal prosecution to testify against himself."

in the face and he went down like a log. * * * Jason Brooks arrived at my place at which point [Beall] repeated the same story several times, again bragging about his one shot 'K.O.' * * *."

Holliday continued in his affidavit:

"On 5-5-06 I was at [a club in Eugene] with Ryan Joyce, James Butler, * * * and some other people. During the course of the evening the subject of [defendant]'s conviction came up. [Joyce] volunteered that he felt bad about letting [defendant] 'take the rap' for [Beall]. I overheard [Joyce] tell James Butler that he was trying to get [Beall] to turn himself in but [Beall] 'wasn't having any of it.' I also heard [Joyce] state that the reason he didn't testify at [defendant]'s trial was that his attorney who was the same as [Beall]'s told him not to. The above is true and correct to the best of my knowledge. I relayed this info about the fight to Det. Williams [Eugene Police Department] a short time after it occurred."

### 3. *Melissa Sayer*

In her affidavit, Sayer states that she is "familiar with Ryan Joyce, J.D. Beall, James Butler, Jason Brooks, Carrie Evans and [defendant]." Sayer averred that, a couple of months after Gillins died, she had dinner with Joyce, during which

"Ryan [Joyce] began sobbing loudly stating that he felt very bad that the guy J.D. Beall hit had died. Ryan stated, 'I ruined J.D.'s my best friend's life' because J.D. was going to jail for hitting the guy who died a few days later. Ryan explained that he was the cause of the fight by telling J.D. that the other three guys involved in the fight had made fun of Ryan. Ryan said he knew J.D. would react and stick up for him. Ryan stated over and over again that if he had not 'egged on' J.D., he would never have hit the guy and none of this would have ever happened. Ryan stated numerous times that J.D. hit the guy, not [defendant] and that he was very bothered by the man's death and the fact that J.D. Beall, his best friend, might go to jail for a long time. * * *"

## D. *Trial Court's Findings*

At the end of the hearing, the trial court concluded that defendant's newly discovered evidence fell into three categories, and it made extensive oral findings:

"[TRIAL COURT]: The first is easily disposed of, and that is the witnesses who supplied affidavits to suggest that Mr. Beall either boasted of or admitted to striking the victim in this case. That evidence was clearly before the jury during the trial. A number of witnesses testified to the boasting. At least one witness said that a day or two later, when Mr. Beall was sober and had come to understand the gravity of what had occurred, that he was remorseful, afraid, talking about leaving town, that sort of thing.

"So the jury clearly heard that testimony. And the evidence, any further evidence about those statements by Mr. Beall, the Court finds, would not have made a difference in this trial. It's not new evidence. It may be more evidence of the same kind, but it's not new. It's an issue that the jury considered. And for whatever reason, nevertheless, there's not a doubt concerning [defendant's] guilt.

"The second category, I guess, would be evidence concerning statements made by Mr. Joyce. * * *

"The statement of Ms. Sayer (phonetic) is a different matter [the third category]. And, frankly, it's a rather difficult issue concerning admissibility, because where the rule gets—basically the rule is that if you make a statement against your penal interest and there are indications that it's otherwise reliable, it can come in. That's a paraphrase.

"Where we get in trouble is where the statement is partly against interest and partly inculpatory towards somebody else. And [Laird C.] Kirkpatrick in his treatise [*Oregon Evidence*], I think suggests that we need to be cautious about those situations.

"Clearly, the statement—well, I'm not so clear—but the State, I think, conceded that the statement that 'I egged him on' certainly can be considered against his interest. When she talks about Mr. Beall throwing the punch, that's another matter. I think, arguably, given the fact that the statement 'I egged him on' is not inculpatory, unless we know that the person who got egged on actually threw the punch, I think arguably the entire statement will have to come in, because one wouldn't make sense without the other.

"So let's assume for the moment that the statement made by Miss Sayer concerning—the affidavit by Miss Sayer concerning Mr. Joyce's statement is admissible. Then

there are two issues there. One is, could this evidence have been discovered with due diligence? That's the defendant's burden, to show that it could not have been. Secondly, would it have changed the trial in this matter?

"There is no showing at this point by the defendant that due diligence was exercised in trying to locate Miss Sayer. In fact, the evidence is actually to the contrary, where one of the defense witnesses, who was apparently helping the investigation in this matter, knew about Miss Sayer and her statement well before the trial, at the time—shortly after the time [defendant] was charged in this case. So if in fact Miss Sayer's testimony would have been admissible at trial, and defendant certainly could have made an effort to offer that, it would have to have shown that Mr. Joyce was unavailable. But I think we all agree that that was not going to be a difficult task at that point. It's apparent to me that Miss Sayer could have been called as a witness.

"Secondly, it seems to me that the Court should, just for the record, should also analyze whether Mr. Joyce's hearsay statement would have changed the outcome of the trial. And I can't make that finding. I think there's certainly that possibility. But the fact is, numerous witnesses testified that Mr. Beall admitted to throwing the punch. Mr. Beall's admission that he threw the punch is a whole lot more convincing than Mr. Joyce's hearsay statement that Mr. Beall threw the punch. I don't know that that statement by Mr. Joyce adds a whole lot. So while it may have changed the outcome, this Court certainly cannot make that finding.

"I'll go a step further. And I probably shouldn't do this. But because I think this case is going up on appeal and there are issues about Mr. Joyce's testimony, I think this case would be in a different posture if Mr. Joyce did testify and that he testified in accordance with the alleged hearsay statement that was made to Miss Sayer. Certainly, an eyewitness testifying in court may well have made a difference in this case.

"But that simply is not before the Court. Mr. Joyce has not testified. Mr. Beall has not testified. And however we all feel about that, the fact is that those witnesses have a right not to testify. And they asserted that right. And that's the end of that discussion.

"So based upon those findings, the Court will deny the motion for [a] new trial."

E. *Analysis*

As previously stated, to justify a new trial, newly discovered evidence must meet each of six requirements: It must (1) be such as will probably change the result if a new trial is granted; (2) be such as, with reasonable diligence, could not have been discovered before or during the trial; (3) be such that it cannot, with reasonable diligence, be used during trial; (4) be material to an issue; (5) not be merely cumulative; and, (6) not be merely impeaching or contradicting of former evidence. *Arnold*, 320 Or at 120-21.

The trial court concluded that all of defendant's purported newly discovered evidence did not satisfy that test to warrant a new trial because it was merely cumulative; or it was such that, with reasonable diligence, could have been discovered before or during trial; or that it would not likely change the result if a new trial were granted. Here, defendant does not argue—nor do we conclude—that the trial court made any predicate legal error. Accordingly, our task is to determine whether "the trial court's decision was within the range of legally correct discretionary choices and produced a permissible, legally correct outcome[.]" *State v. Rogers*, 330 Or 282, 312, 4 P3d 1261 (2000) (explaining the "abuse of discretion" standard of review).

In this case, we agree with the trial court that each item of defendant's newly discovered evidence offered in support of his motion for a new trial failed to meet at least one of those six requirements.

### 1. *Jordan Holliday's Affidavit*

■ We start with Holliday's affidavit, which can be broken into two parts. Part one concerns Beall's statement made shortly after the brawl: that Beall "punched [Gillins] in the face" causing Gillins to fall "down like a log." The trial court determined that that statement was not newly discovered evidence. We agree. The substance of Holliday's expected testimony was cumulative of the testimony of at least five other witnesses who testified at trial that each had heard Beall say it was he who threw the punch that killed Gillins.

■ Part two concerns events that occurred on May 5, 2006, after defendant was found guilty, but before he was

sentenced. In Holliday's affidavit, he recites some of Joyce's statements that Joyce "felt bad about letting [defendant] 'take the rap' for [Beall,]" and "that the reason [Joyce] didn't testify at [defendant]'s trial was that his attorney who was the same as [Beall]'s told him not to."

As the trial court observed, that evidence is problematic because it includes Holliday's recitation of statements that Joyce made that do not inculpate Joyce, but rather, inculpate Beall. Additionally, Joyce's purported statement that he let defendant take the "rap" for Beall is helpful to defendant only if the factfinder accepts defendant's underlying argument—that it was Beall and not defendant who hit Gillins. However, like the trial court, we conclude that any statements by Joyce that inculpate Beall are cumulative of evidence admitted at trial and considered by the jury. Therefore, we do not address the admissibility of Holliday's averments concerning what he heard on May 5.

## 2. *Melissa Sayer's Affidavit*

■ We next consider Sayer's affidavit in which she reports that "Joyce [said he] felt very bad that the guy J.D. Beall hit had died." Here, as with Holliday's affidavit, Sayer is repeating Joyce's statements that are more inculpatory toward Beall than toward Joyce himself. We agree with the trial court that the evidence from Sayer's affidavit was such that it would not likely change the result if a new trial were granted, or, in the alternative, it could have been discovered before or during trial with the exercise of reasonable diligence.

In *State v. Farmer*, 210 Or App 625, 152 P3d 904 (2007), this court considered the denial of the defendant's motion for a new trial based on newly discovered evidence of the statement of an eyewitness who had called 9-1-1 to report a shooting, but who could not be located in time for trial. In an affidavit, the eyewitness averred that the defendant was not the shooter. *Id.* at 627. In affirming the trial court's denial of the defendant's motion, we stated that

"[t]here * * * is tension in our case law regarding the extent to which the court determines whether new evidence

would be believed by the jury. In some cases, we have determined that the new evidence is simply too unbelievable to change the result if a new trial were granted. * * * In other cases, where the proffered newly discovered evidence could be believed by a reasonable jury *and meets all of the other criteria*, we have concluded that the result at trial would probably be different. * * *

"* * * That assessment necessarily is based not on a prediction that the jury will believe the evidence but rather on an assessment that the evidence could be believed by a reasonable jury and, if so, would probably change the result."

*Id.* at 643. (Emphasis added.)

Here, the trial court could conclude that Sayer's testimony would not likely change the result, given the evidence offered at trial and considered by the jury. That evidence includes the testimony of five witnesses who each heard Beall admit that he punched Gillins, and defendant, who testified that he saw Beall punch Gillins.

■ The trial court determined, as a separate ground for denying defendant's motion, that, in the event that Sayer's testimony was admissible hearsay, defendant did not meet his burden of showing that, with reasonable diligence, the evidence could not have been discovered before or during the trial. The record supports the trial court's determination that, with the exercise of reasonable diligence, defendant would have known about Sayer as a potential witness. Specifically, a different affidavit suggests that defendant, Beall, Joyce, and Brooks attended a party at Sayer's home the day after the fight, and that Joyce, Beall, and defendant repeatedly stated that Beall "had thrown the 'knock out' punch." Based on that information, the trial court did not abuse its discretion in determining that defendant should have known that Sayer was a potential defense witness.

What is more, Sayer provided a second affidavit at the request of the state. Sayer's second affidavit further supports the trial court's determination that defendant had not met his burden of reasonable diligence in identifying and locating Sayer as a potential witness because, prior to trial, at least two defense witnesses, Evans and Butler, knew

about Sayer's conversation with Joyce. *See State v. Fentress*, 35 Or App 63, 67, 580 P2d 1044 (1978) (anticipated exculpatory testimony of a new witness—the defendant's newly discovered evidence—could have been discovered by the defendant with the exercise of reasonable diligence where one of the defendant's witnesses who testified at trial knew about the purported new witness and knew that that witness had knowledge that could aid the defendant in his defense). Thus, the trial court did not abuse its discretion when it denied defendant's motion for a new trial based on newly discovered evidence.

## IV. JOYCE'S CLAIM OF PRIVILEGE

■　We turn to defendant's second assignment of error that the trial court erred when it accepted Joyce's blanket claim of privilege at the hearing on defendant's motion for a new trial and refused to inquire into the basis for Joyce's claim or compel Joyce's testimony. At the hearing, the following colloquy took place:

"[TRIAL COURT]:　*** I believe that when we continued the hearing [on defendant's motion for a new trial] from the earlier date that we had—Mr. Joyce had been called as a witness. He had indicated that he wished to speak with a lawyer. We had a lawyer available for him at that time, however, he wished to hire his own. And my understanding is that he's done that ***.

"* * * * *

"Mr. Joyce, if you'd come forward, please. You have had an opportunity to discuss this matter with your lawyer?

"[JOYCE]:　Yes.

"[TRIAL COURT]:　Are you willing to be a witness in this case?

"[JOYCE]:　No.

"[TRIAL COURT]:　Will you state the basis for that, please.

"[JOYCE]:　I refuse to testify based on my privilege against self-incrimination."

At the hearing for a new trial, defendant argued that, pursuant to ORS 136.617, the court had authority to

inquire as to the basis of Joyce's asserted privilege and, depending upon the results of that inquiry, to order or compel Joyce to testify.[5]

"[DEFENSE COUNSEL]: On behalf of the defendant, under the circumstances we'd ask the Court, *pursuant to ORS 136.617*, to inquire as to the basis for the privilege, and depending upon that inquiry be prepared to order or compel the witness to testify.

"[TRIAL COURT]: What's the State's position?

"[PROSECUTOR]: Well, I would object to the Court's doing so. I know no authority that allows the Court to do so. Specifically *that statute, 136.617*, does not state that the Court has authority to do so. And at this point, the State is not offering any type of immunity to Mr. Joyce, which is really what *that statute* is about.

"* * * * *

"[DEFENSE ATTORNEY]: Your Honor, I'd point out that *the statute*, in rebuttal to [the state's] comments, that *that statute* provides a procedure where the prosecuting attorney may move the Court for those sorts of orders. There's nothing in *that statute* that says the Court does not have the inherent power, either pursuant to *that statute* or independently, to do the same thing as contemplated by *the statute*.

"[PROSECUTOR]: And just so the record is clear, the State is not so moving.

---

[5] ORS 136.617 provides:

"In any criminal proceeding before a court of record * * *, if a witness refuses to testify or produce evidence of any kind on the ground that the witness may be incriminated thereby, the prosecuting attorney may move the court to order the witness to testify or produce evidence. The court shall forthwith hold a summary hearing at which the prosecuting attorney shall show reasonable cause to believe the witness possesses knowledge relevant to the proceeding, or that no privilege protects the evidence sought to be produced. The witness may show cause why the witness should not be compelled to testify or produce evidence. The court shall order the witness to testify regarding the subject matter under inquiry upon such showing of reasonable cause or shall order the production of evidence upon a finding that no privilege protects the evidence sought, unless the court finds that to do so would be clearly contrary to the public interest. The court shall hold the summary hearing outside the presence of the jury and the public and may require the prosecuting attorney to disclose the purpose of the testimony or evidence. The witness shall be entitled to be represented by counsel at the summary hearing."

"[TRIAL COURT]: The way I read *that statute* is that none of that procedure gets instigated until such time as the State moves the Court to make that inquiry. And so I will deny your motion."

(Emphasis added.)

On appeal, defendant abandons his statutory argument. Instead, defendant argues that the trial court violated his constitutional rights when it accepted Joyce's blanket assertion of the privilege against self-incrimination without inquiring into the basis for that assertion. Defendant concedes that his constitutional argument is not preserved. Nonetheless, he urges consideration of the error under ORAP 5.45(1) as error apparent on the face of the record.

■ ORAP 5.45(1) provides that "the appellate court may consider an error of law apparent on the face of the record." We may review a "plain error" under this rule when (1) the error is one of law; (2) the error is "apparent," that is, where the legal point is obvious, meaning not reasonably in dispute; and (3) the error appears "on the face of the record," meaning that the error does not require the court to go outside the record or select among competing inferences. *State v. Brown*, 310 Or 347, 355, 800 P2d 259 (1990).

Even if defendant's second assignment of error is an error apparent on the face of the record, this court cannot address it unless we exercise our discretion to do so using such factors as those identified in *Ailes v. Portland Meadows, Inc.*, 312 Or 376, 382 n 6, 823 P2d 956 (1991) ("the competing interests of the parties; the nature of the case; the gravity of the error; the ends of justice in the particular case; how the error came to the court's attention; and whether the policies behind the general rule requiring preservation of error have been served in the case in another way").

The difficulty with defendant's argument, however, is that we cannot tell whether there was an error apparent on the face of the record. Only in his reply brief does defendant attempt to explain why his constitutional challenge is reviewable as error apparent on the face of the record. Defendant argues that an "error in the application of the constitutional privilege against self incrimination to a particular set

of facts constitutes an error of law." Defendant continues, "[a]s a result, the Trial Court's interpretation and application of these [constitutional] provisions were 'questions of law' resulting in 'legal error' if incorrect."

Defendant did not alert the trial court to any constitutional "error in the application" of Joyce's invocation of privilege. Had defendant done so, the trial court would have been able to consider defendant's constitutional challenge, and the state would have been able to develop a different record that addressed defendant's argument. Here, defendant did not alert the trial court that he was challenging Joyce's invocation of privilege on any ground aside from ORS 136.617, let alone rely on the federal constitutional argument that defendant now raises, for the first time, on appeal.

It would not serve the policies underlying the general rule of requiring preservation to review defendant's assignment on a plain error basis, *Ailes*, 312 Or at 382 n 6. Accordingly, even if defendant's second assignment of error is plain error, an issue that we do not decide, we would decline to exercise our discretion.

## V. CONCLUSION

To summarize, the trial court did not abuse its discretion by concluding that defendant's newly discovered evidence did not meet the requirements to justify a new trial: specifically, the trial court acted within its discretion when it concluded that defendant's new evidence (1) probably would not change the result if a new trial was granted; (2) could, with reasonable diligence, have been discovered before or during the trial; or (3) was merely cumulative. Accordingly, the trial court did not err in denying defendant's motion for a new trial. As to defendant's second assignment of error, defendant did not preserve that claim of error, and we do not review it as plain error.

Affirmed.