Argued and submitted November 7, 2011, decision of Court of Appeals affirmed in part and reversed in part, and case remanded to Court of Appeals to consider defendants' unresolved assignments of error February 24, 2012

GREENWOOD PRODUCTS, INC.,
an Oregon corporation;
and Jewett-Cameron Lumber Corp.,
an Oregon corporation,
*Petitioners on Review,*

*v.*

GREENWOOD FOREST PRODUCTS, INC.,
an Oregon corporation;
Jim Dovenberg, an individual;
and Bill LeFors, an individual,
*Respondents on Review.*

(CC050302553; CA A135701; SC S059097)

273 P3d 116

Kevin H. Kono, Davis Wright Tremaine LLP, Portland, argued the cause for petitioners on review. Timothy R. Volpert filed the brief for petitioners on review. With him on the brief were Kevin H. Kono and Robert D. Newell.

Maureen Leonard, Portland, argued the cause and filed the brief for respondents on review. With her on the brief was Ron D. Ferguson.

Cody Hoesly, Larkins Vacura LLP, Portland, filed the brief for *amicus curiae* Oregon Trial Lawyers Association.

WALTERS, J.

## WALTERS, J.

Greenwood Products, Inc.,[1] and Jewett-Cameron Lumber Corp., (hereinafter plaintiffs), who obtained a jury verdict in their favor on a breach of contract claim against Forest Products, Dovenberg, and LeFors (hereinafter defendants), seek review of a Court of Appeals decision reversing the judgment entered on that verdict. The contract in question required defendants to sell, and plaintiffs to buy, all of defendants' large and ever-changing inventory, for a certain percentage over defendants' cost for that inventory. In their action against defendants, plaintiffs alleged that defendants had breached the contract by erroneously accounting for their cost of inventory—causing plaintiff to pay some $820,000 more for the inventory than it should have. Defendants moved for a directed verdict on the breach of contract claim, but the trial court denied the motion and sent the claim to the jury, which returned a verdict for plaintiffs. The Court of Appeals held that the trial court should have granted defendants' motion for a directed verdict because the contract did not impose any obligation on defendants to accurately account for the cost of the inventory. For the reasons discussed below, we reverse the Court of Appeals decision in part and remand to that court to consider other issues that defendants raised in their appeal.

Because we are reviewing a trial court's denial of a motion for a directed verdict, we consider and present the facts in the light most favorable to the party that opposed the motion—in this case, plaintiffs. *Knepper v. Brown*, 345 Or 320, 323, 195 P3d 383 (2009). In 2002, when the events that led to the action in question took place, defendant Forest Products was an Oregon corporation whose primary shareholders were two individuals, defendant Dovenberg and defendant LeFors. Forest Products was in the business of processing and selling industrial wood products, and maintained a large inventory of such products at numerous distribution centers throughout the United States. Dovenberg was

---

[1] The company we call "Forest Products" in this opinion in fact is "Greenwood Forest Products, Inc." and the company we call "Greenwood" in fact is "Greenwood Products, Inc." Because the companies' real names are so similar, we have adopted the "Greenwood" and "Forest Products" denominations to avoid confusion.

friendly with Boone, the financial and administrative head of, and largest shareholder in, Jewett-Cameron Lumber Co., a wholesale distributor of lumber and related materials. Dovenberg had expressed to Boone his interest in selling Forest Products or otherwise retiring from the business. Initially, Boone felt that it would be unwise for Jewett-Cameron to attempt any kind of purchase of the business, because acquisition of Forest Products' enormous inventory would be overwhelming. In 2001, however, Dovenberg and Boone conceived a plan that would allow Jewett-Cameron to acquire Forest Products' inventory over time.

Under the plan, Jewett-Cameron would create a wholly owned subsidiary, Greenwood Products, Inc. (Greenwood) that initially would acquire Forest Products' equipment and place of business and would hire most of its employees. Greenwood then would proceed to purchase Forest Products' nationwide inventory over a two-year period, in geographically determined "units." Until a particular unit's inventory was sold, Forest Products would continue to sell and replenish inventory within the unit, using employees loaned back to it by Greenwood. Eventually, after all the units of inventory were sold to Greenwood, Forest Products would be stripped of its assets, and its involvement in its former business would end (Forest Products itself, however, would continue to exist).

To facilitate the plan, Forest Products and Greenwood/ Jewett-Cameron entered into an Asset Purchase Agreement (the APA).[2] The APA provided that, on a designated closing date—February 28, 2002—Greenwood would purchase Forest Product's furniture and equipment and a license to use certain of Forest Product's intangible assets, and would take over Forest Product's lease on its offices. Also by the February 28, 2002, closing date, Forest Products would dismiss most of its employees, and Greenwood would rehire them.[3]

---

[2] Although the agreement technically was between Forest Products and Jewett-Cameron (Greenwood did not yet exist), we refer to Greenwood as the contracting party throughout the following discussion—again, to avoid confusion.

[3] The APA specifically provided:

   **"4.4 Forest Products' Employees.** * * *

The APA provided that, over a two-year period after the closing date, Greenwood would purchase Forest Product's nationwide inventory in seven installments or "units":

> **"1.4. Purchase of Inventories.** *[Forest Products] agrees to sell and [Greenwood] agrees to purchase [Forest Products'] inventories, work in process, raw materials and packaging (except the portions which are unusable as agreed by the parties prior to transfer) in stages over a two year period following closing, for a price equal to [Forest Products'] cost (including transportation, processing and storage) plus a premium of 2%,* as follows: immediately upon execution of this agreement and prior to closing the parties will separate the inventory into seven discrete units by location. [Forest Products] shall sell and [Greenwood] shall purchase the first unit of inventory on May 31, 2002, and [Forest Products] shall sell and [Greenwood] shall purchase an additional unit at the end of each three month period thereafter until all of the units of inventory have been sold and purchased. The specific unit of inventory to be sold at the end of each three month period shall be selected by mutual agreement of the parties. Payment for each unit of inventory shall be due 30 days after purchase. Conveyance shall be by Bill of Sale."

(Emphasis supplied). Finally, the APA provided for management of Forest Product's inventory during the transition period in the following terms:

> **"1.5. Interim Services and Supply Agreement.** During the two-year inventory transition period [Forest Products] agrees to replenish, process, and maintain inventories in keeping with its past practice at each of the locations where the inventory has not yet been sold. [Greenwood] agrees to provide [Forest Products] with all management and administrative services associated with purchasing, processing, and maintaining [Forest Products']

---

"[Forest Products] shall determine which, if any, of its employees it wishes to retain after it has disposed of its principal business and shall terminate all of its other employees on or before the closing. [Forest Products] shall indemnify and hold [Greenwood] harmless from any and all liability concerning any action, complaint, grievance, or proceeding filed by any employee for any act alleged to have been committed before the closing.

"[Greenwood] agrees to offer employment to all of the employees of [Forest Products], but not necessarily at the same rate of compensation or with equivalent fringe benefits."

inventory at each such location for a fee of $150 per month for each unit of the 7 units of inventory described in Section 1.4 above that is retained by [Forest Products]. During the inventory transition period [Forest Products] will also sell inventory from such retained locations in the regular course of business exclusively to [Greenwood] to allow [Greenwood] to fill customer orders. *[Greenwood] shall pay 102% of [Forest Products'] costs for all such purchases* and payment shall be due 30 days after invoice and shipping. [Greenwood] agrees to assume the credit risk associated with its customers and to bear the loss of nonpayment."

(Emphasis supplied.)

Thus, every three months after closing, Greenwood would purchase, in a single transaction, all of Forest Products' inventory in a given geographic "unit" (including products in warehouses, products being processed, and products en route from one location to another), paying Forest Products the cost of the inventory plus two percent. Until a particular geographic unit of inventory was sold in that manner, employees of Greenwood (who formerly had worked for Forest Products and were, in essence, contracted out to Forest Products for a nominal $150 per month fee) would manage the sale, processing, and replenishing of inventory in the unit in much the same manner as they previously had for Forest Products, with Forest Products being paid by Greenwood for the cost of any inventory sold plus a two percent premium. After a unit of inventory was sold, Forest Products would be, in the words of one witness, "out of the picture as far as * * * that product line, and that area," and Greenwood would step into Forest Products' shoes and be responsible for providing its own inventory.

After closing on February 28, 2002, Greenwood took over Forest Products' offices and equipment. Most of Forest Products' employees and management all became employees of Greenwood, holding the same positions that they had occupied at Forest Products. Forest Products continued to exist side-by-side with Greenwood—with Forest Products responsible, at least on paper, for maintaining the inventory that Greenwood employees sold. What this meant in practice was that, in those "units" that had not yet been purchased by

Greenwood, Greenwood employees sold wood products to outside customers, purchasing inventory to cover each sale from Forest Products, at cost plus two percent. The purchases and sales were tracked automatically on two sets of books—as one witness described it, "when a sales entry was made, it was made in one company and automatically appeared as a * * * purchase and a sale in the other company." Although, as noted, Forest Products was responsible, during the transition, for replenishing, processing, and maintaining the supply of inventory that Greenwood employees would be selling, it was Greenwood employees who actually performed all of that work, under the "management and administrative services" provision of the asset purchase agreement.

In fact, the parties interpreted the "management and administrative services" provision as extending to the work performed at Forest Products' highest levels. After the closing, Forest Products retained only two employees— Dovenberg and LeFors; the remainder of the company's central staff went to work for Greenwood. Various key Greenwood employees, including Fahey, the head bookkeeper, and Patillo, the vice president, spent part of their day attending to Forest Products' accounts and overseeing that company's operations. In practice, it was difficult to say which "hat" a given employee was wearing at any given time.

After the February 28, 2002, closing, units of inventory were purchased and sold as the parties had envisioned for some 13 months, at which point the parties agreed to "finish it off" in a single transaction. At that point, Greenwood issued two promissory notes, dated March 18, 2003, for the remaining inventory. A few months later, in June 2003, Greenwood issued another promissory note and paid some $100,000 in cash for "an accumulation of payable for prior purchases of inventory that were due for payment." The amounts of the notes and cash payment were based on inventory numbers provided by traders' assistants and other higher level "accounting people" (including Fahey and Patillo) who, at the time of the sale and purchase, were employed by Greenwood but who provided inventory-related

services to Forest Products.[4] At the time of the final payments and transfers, the transaction set out in the APA appeared to be essentially completed.

In August 2003, Greenwood's books were audited by a certified public accountant, Schmidt. Schmidt found certain unusual entries in the books—an unexplained account with a balance of nearly $1.2 million and many entries that did not appear to be related to normal inventory activity. Schmidt suspected that there was a problem with the "intercompany account," *i.e.*, the accounting of sales of inventory between Greenwood and Forest Products. On the theory that any inventory transactions by Greenwood also should be reflected in Forest Products' books, Schmidt asked for, and obtained, permission to review Forest Products' books. While comparing those books with Greenwood's books, Schmidt found hundreds of entries that did not match. Schmidt eventually decided that, to really understand what had happened with the inventory, he would have to reconstruct both Greenwood's and Forest Products' books from scratch, using "invoices and purchase orders and all the underlying documentation that would happen on a day-to-day basis in a business." When Schmidt completed that work, the figures led him to the conclusion that Greenwood had paid Forest Products for $819,731.68 of inventory that it never had received.

After Schmidt completed his work on Forest Products' books, Dovenberg approached him about some inconsistencies in Dovenberg's own personal accounts. Schmidt attempted to help Dovenberg sort out the problem. Ultimately, the two men determined that Fahey, the bookkeeper (who was employed by Greenwood but was providing inventory-related services to Forest Products) had embezzled at least $360,000 from Forest Products accounts between February and December 2002. As it turned out, Fahey had attempted to hide the embezzlement by adding false entries in the inventory accounting between Forest Products and

---

[4] The value of the inventory involved in the final transaction apparently was presented to Greenwood by Patillo at a meeting of Greenwood's board of directors on March 13, 2003. It was at that meeting that the board approved the issuance of the promissory notes and the amounts of those notes.

Greenwood, and those entries appeared to be the cause of at least some of the discrepancy that Schmidt had identified between the inventory Greenwood had paid for and the inventory it received.[5]

The parties had some discussions about how to deal with Greenwood's alleged overpayment, but those discussions were unproductive. Eventually, Greenwood and Jewett-Cameron (hereinafter plaintiffs) filed the present action against Forest Products, Dovenberg, and LeFors (hereinafter, defendants) asserting breach of contract and equitable claims for reformation or rescission of the promissory notes.[6] Plaintiffs also sought, as damages, some $101,000 for accounting fees incurred in unraveling the parties' books and nearly $102,000 for excess interest incurred because of the initial incorrect accounting. Defendants answered, denying many of plaintiffs' allegations and asserting defenses of accord and satisfaction, waiver, and estoppel. Defendants also asserted several counterclaims, including a claim based on plaintiffs' failure to pay the entire face value of their promissory notes to Forest Products (by that time, plaintiffs had paid part of the face value of the notes).

The case went to trial, and plaintiffs presented the testimony of only two witnesses—Boone and Schmidt—in their case-in-chief. At the close of plaintiffs' evidence, defendants moved for a directed verdict on plaintiffs' breach of contract claim, which alleged that Forest Products had breached the APA by "intentionally or negligently misstat[ing] its cost of inventory such that [Greenwood] signed notes and paid cash for that inventory at a figure that was $819,731.68 higher than it should have been." In the midst of the arguments on that motion, plaintiffs offered to amend their claim to eliminate the "intentionally or negligently" wording (which, as defendants had pointed out, was suggestive of a tort claim). The trial court stated that such a motion was unnecessary and ruled against defendants' directed verdict

---

[5] Forest Product eventually brought a civil action against Fahey and obtained a $369,000 damages award. Fahey also was criminally prosecuted and was convicted before the trial in the present breach of contract action.

[6] The original complaint contained only breach of contract and reformation claims. The rescission claim was added by amendment midtrial.

motion. Later, plaintiffs formally moved to amend the breach of contract claim, and this time the trial court expressly allowed the motion, approving new wording that alleged that Forest Products had breached the agreement by "erroneously account[ing] for its inventory such that [Greenwood] signed notes and paid cash for that inventory at a figure that was $819,731.68 higher than it should have been." Defendants thereafter renewed their directed verdict motion, but the trial court again denied it.

In the end, the jury returned a verdict for plaintiffs on the breach of contract claim, finding that plaintiff had been damaged in the amount of $819,731.68 for the overpayment of inventory and $52,592.09 for accounting fees incurred in ferreting out the accounting errors (the jury also found that Forest Products was entitled to recover unpaid amounts, which it determined to be $1,043,757, on the promissory notes, and that Dovenberg was entitled to receive $71,170.58 in commissions from Greenwood).[7] The court thereafter decided plaintiffs' equitable claims in defendants' favor and entered a judgment awarding damages according to the jury's verdicts. In a supplemental judgment, the trial court found that both parties had prevailed in part and awarded attorney fees to both sides.

Defendants appealed the general and supplemental judgments, and plaintiffs cross-appealed. With regard to the general judgment, defendants' primary contention was that the trial court had erred in denying defendant's directed verdict motions. Defendants argued, among other things, that "the allegation and the evidence fail[ed] to state a claim in this arm's length contractual relationship." In so arguing, defendants referred specifically to plaintiffs' unamended breach of contract claim, with its "intentionally or negligently" wording. Apparently based on that wording, defendants insisted that the claim was actually a claim for tortious misrepresentation and that plaintiffs had failed to offer the level of evidence required to prove such a tort claim (clear and

---

[7] After the jury returned its verdicts, the parties argued about whether the verdicts were internally inconsistent and whether the court should enter a judgment that "corrected" the supposed misunderstanding. The trial court ultimately determined that the verdicts were not inconsistent, and neither party has challenged that determination in this court.

convincing evidence) and had failed to present any evidence at all on a necessary element of a negligent misrepresentation claim (the existence of a "special relationship").

The Court of Appeals, however, recast defendants' assignment of error as a claim that "there could be no breach *because the APA did not obligate Forest Products to properly state the cost of its inventory." Greenwood Products v. Greenwood Forest Products*, 238 Or App 468, 480, 242 P3d 723 (2010) (emphasis added). With that claim of error in mind, the Court of Appeals examined the two provisions of the agreement that it deemed to be relevant to the question— (1) section 1.4, which provides that "[Forest Products agrees to sell and [Greenwood] agrees to purchase [Forest Products'] inventories * * * for a price equal to [Forest Products'] cost * * * plus a premium of 2%," and (2) section 1.5, which states that "during the two-year inventory transition period, [Forest Products] agrees to replenish, process, and maintain inventories in keeping with its past practice at each of the locations where the inventory has not yet been sold."

The Court of Appeals concluded that the two provisions, in fact, did *not* obligate Forest Products to accurately state the cost of its inventory. It explained:

> "[N]either provision expressly imposes an obligation on either Forest Products or Greenwood to accurately state the cost of that inventory to the other. Nor is such an obligation necessarily implicit in the obligations that those provisions do explicitly impose. Thus, Forest Products was not obligated under the APA to accurately state the cost of its inventory."

*Id.* at 481. The court went on to consider whether the answer was any different under the amended version of the breach of contract claim, and concluded that it was not:

> "Just as the APA imposed no obligation on Forest Products not to 'misstate[ ] its cost of inventory,' it imposed no obligation not to 'erroneously account[ ] for its inventory.' Even if the latter could be deemed to be somewhat broader than the former, ultimately both are predicated upon a purported contractual obligation for Forest Products to accurately account for its inventory to Greenwood. Again the

APA imposes no such obligation explicitly or by necessary implication."

*Id.* at 482. The court concluded that defendants were entitled to prevail on their directed verdict motion, and it reversed the trial court's judgment for plaintiffs on that claim. Once the Court of Appeals decided to reverse the trial court's judgment for plaintiffs on their breach of contract claim, the court was required to reverse the trial court's award of attorney fees to plaintiffs on that claim, and it did so. *Id.*[8]

Plaintiffs petitioned for review by this court, and we allowed their petition to consider the Court of Appeals' pronouncement that the asset purchase agreement imposed no contractual obligation on defendants (or plaintiffs, for that matter) to accurately state the cost of the inventory. Because it seemed to us that the agreement may have *implied* such an obligation, we asked the parties to answer a series of questions about that issue. In their response, plaintiffs argued at length that a requirement that someone be responsible to accurately account for or state the cost of inventory was necessary to carry the clear intentions expressed in the APA into effect (and, thus, was "necessarily implied")[9] because, otherwise, the heart of the parties' agreement—that Forest Products would charge, and Greenwood would pay, Forest Products' *actual* cost for the inventory it *actually* transfers to Greenwood plus two percent—could not be realized. Plaintiffs also argued that the APA necessarily and impliedly placed that obligation on Forest Products, rather than

---

[8] The Court of Appeals also (1) reversed the trial court's decision about defendants' ability to recover expert expenses incurred in enforcing payment on the promissory notes plaintiffs had issued; and (2) rejected plaintiffs' cross-appeal, which challenged the denial of plaintiffs' rescission claim, on the ground that the issue had not been preserved. *Greenwood Products*, 238 Or App at 485-86. Plaintiffs have not challenged those other decisions in this court and we do not address them in this opinion.

[9] Plaintiffs relied on the doctrine of necessary implication, which holds that

"[i]f it can be plainly seen from all the provisions of the instrument taken together, that the obligation in question was within the contemplation of the parties when making their contract, or is necessary to carry their intention into effect—in other words, if it is a necessary implication from the provisions of the instrument—the law will imply the obligation and enforce it."

*Card v. Stirnweis*, 232 Or 123, 134, 374 P2d 472 (1962) (quoting *Pinnacle Packing Co. v Herbert*, 157 Or 96, 106, 70 P2d 31 (1937)).

Greenwood, because the information that would be needed to determine the amount and cost of inventory involved in the transaction would be in Forest Products' financial records, which Forest Products would have a right to control. Forest Products argued, in response, that, insofar as the APA obligated Greenwood to "provide [Forest Products] with all management and administrative services associated with purchasing, processing and maintaining [Forest Products'] inventory" at each unit during the period of transition, and insofar as Greenwood employees in fact managed the accounts for both Greenwood and Forest Products, an obligation on Forest Products to account for the amount and cost of the inventory involved in the transaction could not be implied.

After considering the parties' responses and the record, we conclude that the Court of Appeals' "no obligation" holding has no basis in any argument that was raised in the trial court. In those circumstances, we also conclude that the Court of Appeals' argument was not a proper basis for reversing the trial court's denial of a directed verdict.[10]

We begin by considering the arguments for a directed verdict that defendants actually raised in the trial court. Defendants' first argument, in their written motion filed at the conclusion of plaintiffs' case-in-chief, was that plaintiffs had "failed to prove any specific act which would constitute a breach of contract between the parties." In their oral presentation of the motion, defendants explained that plaintiffs had alleged, and were therefore required to prove, that defendants had intentionally or negligently "misstated" the cost of inventory and that plaintiffs failed to present any evidence showing that, at any point after closing, anyone connected with Forest Products ever had made *any* "statement" about the cost of inventory. Defendant suggested that, in fact,

---

[10] The problem that we are identifying—the fact that the Court of Appeals reversed on the basis of a perceived error that was not raised in the trial court—is not just a technical one. To apply the doctrine of necessary implication, a court must consider and interpret the express terms of the agreement between the parties and other admissible evidence to determine the parties' intent. In this case, because the argument was never raised, plaintiffs had no occasion to present the arguments and evidence that they could have presented in support of the existence of an implied obligation on Forest Products to accurately account for or state the amount and cost of the inventory.

all of the evidence that plaintiffs had presented showed that it was Greenwood and its employees who had stated the cost of the inventory.

Plaintiffs responded, however, that their evidence was directed at showing that Forest Products ultimately had the right to control its own accounting and that, when Greenwood's employees made any statements about the cost of Forest Products' inventory, they were acting as Forest Products' servants. Plaintiffs pointed to testimony by Boone that, under the contract, Forest Products remained responsible for its own accounting. Plaintiffs also observed that the jury had heard testimony that Dovenberg and LeFors continued to have offices at Forest Products and that they had a right to, and did, obtain information about Forest Products' inventory—testimony that suggested that the two men understood that they had a right and responsibility to control Forest Products accounting and had made at least some efforts in that area. Plaintiffs argued that the evidence before the jury was sufficient to defeat defendants' suggestion that, as a matter of law, Forest Products had never made or participated in any statement about the cost of inventory. The trial court apparently agreed with that assessment, insofar as it denied defendant's motion for a directed verdict. This court also agrees: Although defendants introduced evidence that Greenwood and its employees were solely responsible for any errors in Forest Products inventory accounts, plaintiffs' evidence about the divided responsibilities of Greenwood employees and the continuing right of control of Forest Products' principals was sufficient to create a jury question.

Defendants' next arguments all were based on the supposition that, insofar as plaintiffs had alleged that Greenwood had "intentionally or negligently misstated its cost of inventory," they were really alleging some sort of tort—intentional or negligent misrepresentation—and not a breach of contract. Defendants argued that plaintiffs had failed to offer evidence that would support a claim for either type of misrepresentation by the "clear and convincing evidence" standard that applies to claims of tortious misrepresentation. Defendants also insisted that plaintiffs could not recover damages for the alleged "negligent misrepresentation" without establishing that a "special relationship"

existed between plaintiffs and defendants—and that they had not and could not prove such a relationship.

Plaintiffs responded that they were not alleging any kind of tortious misrepresentation and that their claim was, in fact, a claim that defendants had breached the agreement by misstating the cost of inventory and by collecting more in payment than they were entitled to receive. They offered to move to strike the "intentionally or negligently" wording, but the trial court suggested that that was unnecessary because "that was included in defendants' motion." Defendants objected that plaintiffs should not be permitted to amend their pleadings "to kind of sweep up this overall theory that he's now trying to put before the court." Plaintiffs responded that, because of prior communications between the parties, defendants were estopped from arguing that plaintiffs should not be permitted to amend their complaint. The trial court did not speak directly to either defendants' objection or plaintiffs' response, but the fact that it denied defendants' directed verdict motion indicates that it was operating under the assumption that the "intentionally or negligently" wording had been stricken and that the claim at issue was not for tortious misrepresentation, but for breach of contract. Given that the trial court took that position, the absence of evidence that would support a claim of either intentional or negligent misrepresentation was not relevant.

Defendants' final argument at trial for a directed verdict was that plaintiffs' evidence did not and could not support a conclusion that the amount of inventory transferred to Greenwood had been misstated in any way. That argument was, in essence, an attack on the methodology that Schmidt had employed to determine that Greenwood had been overcharged. Defendants argued that, although Schmidt's analysis may have revealed significant accounting problems between Greenwood and Forest Products, it could not determine the *actual* amount of inventory that was transferred—and that Schmidt had acknowledged as much. It followed, defendants argued, that there was no evidence to support plaintiffs' allegation that Greenwood had paid for more inventory than it received, *i.e.*, that the cost of the inventory transferred had been misstated.

The trial court properly rejected that argument. Schmidt testified that he had based his analysis on the amount and value of inventory that had been reported for various transactions, and that his assumption was necessary, because there was no way to go back and physically count the inventory in question. Schmidt's assumptions and overall analysis may not have been the *only* way to go about assessing whether Greenwood had overpaid for the inventory that it had received, but those assumptions and analyses were reasonable and clearly constituted evidence that would support a jury verdict for Greenwood.

We have rejected each of the three arguments that defendants raised in the trial court in support of their directed verdict motion. Although defendants renewed their directed verdict motion later in the trial—after plaintiffs had been permitted to amend the breach of contract claim to allege that defendants had breached the contract by erroneously account[ing] for its inventory"—defendants did not advance additional reasons for granting their motion but simply stated that the motion was based on "all the reasons previously announced."[11]

We turn, then, to an entirely different argument— the one that the Court of Appeals relied on to reverse the trial court's denial of defendants' directed verdict motions. As discussed above, 351 Or at 613-14, the Court of Appeals held that defendants could not be found in breach of their obligation under the agreement to state or accurately account for the cost of inventory *because the agreement placed defendants under no such obligation.*

There is a simple reason why that argument did not provide a basis for granting defendants' motion for a directed

---

[11] We assume that, when defendants thus referred to their "previously announced" reasons, they intended to adapt those reasons to the amended wording of the complaint. Thus, we assume that, in their second motion, defendants were objecting that there was no evidence that any person connected with Forest Products had engaged in accounting at all, much less the "erroneous accounting" that plaintiffs had alleged as a breach of contract. That argument fails for the same reason that the corresponding argument in defendant's original motion failed— there was at least some evidence before the jury that would allow it to conclude that defendants ultimately were responsible for the accounting that was used to calculate what plaintiffs owed.

verdict. As we have recounted, defendants offered three arguments to the trial court for directing a verdict for defendants on the breach of contract claim. The argument that the Court of Appeals advanced was not one of them.[12] Because the trial court never had an opportunity to consider the argument, it is not, and was not, a proper basis for reversing the trial court's decision. *See Remington v. Landolt*, 273 Or 297, 302, 541 P2d 472 (1975) (grounds not stated in motion for directed verdict will not be considered by appellate court). *See also* ORCP 60 ("A motion for a directed verdict shall state the specific grounds therefor.").

We have concluded that the trial court in this case properly rejected each of the grounds that defendants' raised at trial for granting their motion for a directed verdict on plaintiffs' breach of contract claim. We also have concluded that the additional argument that the Court of Appeals relied on in reversing the trial court—that the obligation that Forest Products supposedly breached did not exist under the contract as a matter of law—was not preserved. It follows that the Court of Appeals decision, which rests on the premise that defendants were entitled to a directed verdict on plaintiffs' breach of contract claim, must be reversed.

Defendants raised other claims of error in the Court of Appeals that, because of its decision on the directed verdict issue, that court either did not address or decided in a way that depended on defendants prevailing on the directed verdict issue. In the latter category is defendants' claim that the trial court erred in allowing plaintiffs' attorney fees on their breach of contract claim—a claim with which the Court of Appeals agreed, resulting in the reversal of the supplemental judgment that allowed the attorney fees. *Greenwood*, 238 Or App at 479. That decision obviously must be reversed: The

---

[12] In an effort to demonstrate that the issue was raised at trial, defendants selectively have quoted from the transcript of the directed verdict arguments, focusing on their own statements to the court that plaintiffs had "failed to identify any specific act which would constituted a breach" and questioning "what exactly is the breach of contract they are trying to collect on?" But, when those statements are read in context, it is clear that they are directed at whether plaintiffs had offered evidence showing that defendants had actually engaged in any action that constituted a misstatement or erroneous accounting, and not at whether, in the first place, the APA imposed on defendants any obligation *not* to misstate or erroneously account for the cost of the inventory.

reasoning underpinning the reversal on attorney fees—that plaintiffs did not prevail on their breach of contract claim—has not been sustained by this court or, at least, remains an open question until defendants' other claims of error are decided. We therefore remand to the Court of Appeals to consider defendants' remaining claims, including their challenge to the trial court's allowance of attorney fees and the amount of those fees.[13]

The decision of the Court of Appeals is affirmed in part and reversed in part, and the case is remanded to the Court of Appeals to consider defendants' unresolved assignments of error.

---

[13] The other matters that remain to be decided on remand are (1) a claim that the trial court erred in denying defendants' motion for a new trial based on newly discovered evidence; and (2) a claim that the trial court erred in instructing the jury concerning the "loaned servant" doctrine when there was no evidence to support that instruction. It strikes us that the latter claim of error may be resolved by our conclusion that "plaintiffs' evidence about the divided responsibilities of Greenwood employees and the continuing right of control of Forest Products' principals was sufficient to create a jury question." 351 Or at 617. However, we leave it to the Court of Appeals to make that determination.