### GREENWOOD PRODUCTS, INC.,
an Oregon corporation;
and Jewett-Cameron Lumber Corp.,
an Oregon corporation,
*Plaintiffs-Respondents*
*Cross-Appellants,*

*v.*

### GREENWOOD FOREST PRODUCTS, INC.,
an Oregon corporation;
Jim Dovenberg, an individual;
and Bill LeFors, an individual,
*Defendants-Appellants*
*Cross-Respondents.*

Multnomah County Circuit Court
050302553; A135701

330 P3d 662

Maureen Leonard and Ron D. Ferguson filed the briefs for appellants-cross-respondents.

Robert D. Newell, Kevin H. Kono, and Davis Wright Tremaine LLP filed the answering-cross-opening brief for respondents-cross-appellants. With them on the supplemental brief was Timothy R. Volpert.

Before Armstrong, Presiding Judge, and Haselton, Chief Judge, and Duncan, Judge.

HASELTON, C. J.

## HASELTON, C. J.

This case is on remand from the Oregon Supreme Court, which reversed, in part, our prior decision and remanded the case to us for further proceedings concerning three assignments of error that we either had no occasion to address in light of our disposition or need to readdress in light of its decision.[1] *Greenwood Products v. Greenwood Forest Products*, 238 Or App 468, 242 P3d 723 (2010) (*Greenwood I*), *rev'd in part and rem'd*, 351 Or 604, 273 P3d 116 (2012) (*Greenwood II*). The dispositive issue on remand concerns the denial of defendants' motion for a new trial under ORCP 64 B(4).[2] For the reasons that follow, we conclude that defendants are entitled to a new trial on plaintiffs' breach of contract claim, based on "newly discovered" evidence. Accordingly, we reverse and remand in part on appeal and affirm on cross-appeal.

The Supreme Court has previously described the circumstances that gave rise to this case—as well as two other legal actions and a disciplinary proceeding—in *Greenwood II* and in its decision reprimanding plaintiffs' attorney for his conduct in litigating this case, *In re Newell*, 348 Or 396, 234 P3d 967 (2010). We take the background facts from our decision in *Greenwood I* and the Supreme Court's decisions in *Greenwood II* and *Newell*, supplemented as necessary with the undisputed facts pertinent to the issue on remand.

Forest Products "was in the business of processing and selling industrial wood products" and "maintained a large inventory of such products at numerous distribution centers throughout the United States." *Greenwood II*, 351 Or at 606. In February 2002, Forest Products and Greenwood

---

[1] In this case, defendants are Greenwood Forest Products, Inc., and its two primary shareholders, Jim Dovenberg and Bill LeFors, and plaintiffs are two entities—that is, Greenwood Products, Inc., and Jewett-Cameron Lumber Corp. Throughout this opinion, we adopt the following conventions in referring to the parties: (1) We refer to defendants and plaintiffs collectively as such and individually by name. (2) Because of the similarity in the parties' corporate names, we adopt the parties' convention of referring to Greenwood Forest Products, Inc., and Greenwood Products, Inc., as "Forest Products" and "Greenwood," respectively. (3) Although plaintiff Jewett-Cameron Lumber Corp. was one of the parties to the asset purchase agreement in this case, as did the Supreme Court, we refer to Greenwood as the contracting party.

[2] The text of the rule is set out below at 264 Or App at 19.

entered into an asset purchase agreement (APA). As pertinent, the APA provided that, (1) by the closing date, Forest Products would dismiss most of its employees who would then be rehired by Greenwood; (2) Greenwood would purchase Forest Products' inventory in seven geographically determined units for cost plus a two percent premium over a two-year period;[3] and (3) until Greenwood's purchase of an inventory unit, Greenwood, for a fee, would provide Forest Products with, in the words of the APA, "all management and administrative services associated with purchasing, processing, and maintaining [Forest Products'] inventory."

As the Supreme Court recounted in *Greenwood II*,

> "[a]fter closing on February 28, 2002, Greenwood took over Forest Products' offices and equipment. Most of Forest Products' employees and management all became employees of Greenwood, holding the same positions that they had occupied at Forest Products. Forest Products continued to exist side-by-side with Greenwood—with Forest Products responsible, at least on paper, for maintaining the inventory that Greenwood employees sold. What this meant in practice was that, in those 'units' that had not yet been purchased by Greenwood, Greenwood employees sold wood products to outside customers, purchasing inventory to cover each sale from Forest Products, at cost plus two percent. The purchases and sales were tracked automatically on two sets of books—as one witness described it, 'when a sales entry was made, it was made in one company and automatically appeared as a * * * purchase and a sale in the other company.' Although, as noted, Forest Products was responsible, during the transition, for replenishing, processing, and maintaining the supply of inventory that Greenwood employees would be selling, it was Greenwood employees who actually performed all of that work, under the 'management and administrative services' provision of the [APA].

> "In fact, the parties interpreted the 'management and administrative services' provision as extending to the work performed at Forest Products' highest levels. After the closing, Forest Products retained only two employees—

---

[3] As the Supreme Court explained, "after all the units of inventory were sold to Greenwood, Forest Products would be stripped of its assets, and its involvement in its former business would end (Forest Products itself, however, would continue to exist)." 351 Or at 607.

Dovenberg and LeFors; the remainder of the company's central staff went to work for Greenwood. Various key Greenwood employees, including Fahey, the head bookkeeper, and Pattillo, the vice president, spent part of their day attending to Forest Products' accounts and overseeing that company's operations. In practice, it was difficult to say which 'hat' a given employee was wearing at any given time.[4]

"After the February 28, 2002, closing, units of inventory were purchased and sold as the parties had envisioned for some 13 months, at which point the parties agreed to 'finish it off' in a single transaction. At that point, Greenwood issued two promissory notes, dated March 18, 2003, for the remaining inventory. A few months later, in June 2003, Greenwood issued another promissory note and paid some $100,000 in cash for 'an accumulation of payable for prior purchases of inventory that were due for payment.' The amounts of the notes and cash payment were based on inventory numbers provided by traders' assistants and other higher level 'accounting people' (including Fahey and Pattillo) who, at the time of the sale and purchase, were employed by Greenwood but who provided inventory-related services to Forest Products. At the time of the final payments and transfers, the transaction set out in the APA appeared to be essentially completed.

"In August 2003, Greenwood's books were audited by a certified public accountant, Schmidt. Schmidt found certain unusual entries in the books—an unexplained account with a balance of nearly $1.2 million and many entries that did not appear to be related to normal inventory activity. Schmidt suspected that there was a problem with the 'intercompany account,' i.e., the accounting of sales of inventory between Greenwood and Forest Products. On the theory that any inventory transactions by Greenwood also should be reflected in Forest Products' books, Schmidt asked for, and obtained, permission to review Forest Products' books. While comparing those books with Greenwood's books, Schmidt found hundreds of entries that did not match. Schmidt eventually decided that, to really understand what had happened with the inventory, he would have to

---

[4] Fahey's culpable activities were central to the trial (and defense) of plaintiffs' breach of contract claim. Defendants' subsequent motion for a new trial was predicated substantially on evidence pertaining to Pattillo's purportedly culpable conduct.

reconstruct both Greenwood's and Forest Products' books from scratch, using 'invoices and purchase orders and all the underlying documentation that would happen on a day-to-day basis in a business.' When Schmidt completed that work, the figures led him to the conclusion that Greenwood had paid Forest Products for $819,731.68 of inventory that it never had received.

"After Schmidt completed his work on Forest Products' books, Dovenberg approached him about some inconsistencies in Dovenberg's own personal accounts. Schmidt attempted to help Dovenberg sort out the problem. Ultimately, the two men determined that Fahey, the bookkeeper (who was employed by Greenwood but was providing inventory-related services to Forest Products) had embezzled at least $360,000 from Forest Products accounts between February and December of 2002."

351 Or 609-11 (footnote omitted; omission in original).

Those circumstances gave rise to three legal actions—including this case. First, in 2004, Forest Products brought a conversion action against Fahey.[5] *Newell*, 348 Or at 399. Second, in March 2005, plaintiffs brought this action against defendants "asserting breach of contract and equitable claims for reformation or rescission of the promissory notes" and defendants asserted counterclaims, "including a claim based on plaintiffs' failure to pay the entire face value of their promissory notes to Forest Products." *Greenwood II*, 351 Or at 612. Third, in April 2005, after being contacted by Forest Products, the district attorney brought criminal charges for theft against Fahey, who hired attorney Andrew Coit to represent him. *Newell*, 348 Or at 399. As we will explain shortly, 264 Or App at 11-12, immediately after his sentencing following the trial in this case—that is, the civil action between plaintiffs and defendants—Fahey executed an affidavit that was the focus of defendants' new trial motion based on newly discovered evidence.

In January 2006, Fahey pleaded guilty to 10 counts of theft. *Newell*, 348 Or at 399. "As part of the plea agreement, Fahey agreed to cooperate with [Forest Products']

---

[5] Ultimately, in May 2005, the trial court entered a judgment against Fahey for approximately $370,000 plus interest. *Newell*, 348 Or at 399.

efforts to locate missing assets, and the trial court delayed the sentencing hearing to give Fahey time to carry out his part of the plea agreement." *Id.* Fahey's sentencing was scheduled for May 2, 2006—approximately one week before trial was scheduled to begin in this case. On May 1, Coit "moved to continue Fahey's sentencing." *Id.* at 400.

Thereafter, plaintiffs' attorney, Robert Newell, learned about the request to set over Fahey's sentencing in the criminal action and that defendants had subpoenaed Fahey to testify in the trial in this case. *Id.* On Friday, May 5, Newell had a subpoena served on Fahey for a deposition that was scheduled to begin 14 hours later on Saturday morning at 9:00 a.m.[6] *Id.* at 400-01. Although Newell served defendants' attorney, Ron Ferguson, with notice of the deposition, he "did not attempt to notify Coit[, Fahey's criminal attorney,] that he had subpoenaed Fahey."[7] *Id.* at 401.

As a result, Newell and Ferguson were present the following morning, but Coit was not. *Id.* At the beginning of the deposition, Fahey made the following statement:

"For the record, I was served yesterday evening at 6:35 p.m. I have not had a chance to contact my counsel. As there is a pending criminal case on this in Washington County, [on] anything alluding to any of those areas I will be taking the Fifth Amendment."[8]

---

[6] Initially, Newell had "not believe[d] that Fahey's testimony would be needed to prove [plaintiffs'] claims against [defendants]." *Newell*, 348 Or at 399.

[7] The Bar eventually filed a disciplinary proceeding against Newell for his conduct related to Fahey's deposition, and the Supreme Court publicly reprimanded him for violating Rule of Professional Conduct 4.2, which, generally, "prohibits a lawyer from communicating on certain subjects with a person whom the lawyer knows is represented on those subjects." *Newell*, 348 Or at 398.

[8] The Fifth Amendment to the United States Constitution provides that "[n]o person shall be * * * compelled in any criminal case to be a witness against himself[.]" As we explained in *Redwine v. Starboard, LLC*, 240 Or App 673, 682-83, 251 P3d 192 (2011),

"[t]hat privilege protects a person from being compelled to testify in any proceeding—including civil proceedings—when the answers may incriminate the person in a future criminal prosecution. The privilege pertains not only to inquiries that would be directly incriminating, but also 'embraces those which would furnish a link in the chain of evidence' needed to prosecute a crime."

(Citation omitted.)

During the deposition, Newell asked Fahey questions about his work at Forest Products, as well as questions about the criminal action, including questions "about the amount of money that Fahey had taken—an issue that was central both to [plaintiffs'] lawsuit against [defendants] and also to the state's criminal charges against Fahey." *Id.* at 403. In response to many questions, Fahey asserted his Fifth Amendment privilege. In addition, he did not respond to some questions because he thought that a protective order precluded him from answering.

Nevertheless, Fahey answered many of Newell's questions. In doing so, Fahey indicated that Greenwood may not have, in fact, paid for more inventory than it had actually received. That was so based on Fahey's "theory" concerning the activities of Pattillo, Greenwood's vice president and his supervisor, in manipulating inventory amounts reflected in Forest Products' computer system. According to Fahey, Pattillo "may have phantomly * * * purchased" inventory, placed it on Forest Products' books, and "then [had] taken [it] off the books prior to those locations being sold to [Greenwood]." Fahey stated that Pattillo had instructed him to remove inventory from Forest Products' books on several occasions and that he "always requested a note or something signed or initialed" from Pattillo before doing so. According to Fahey, he placed the documentation from Pattillo in a file with other miscellaneous documents at the end of each month.

Newell also asked Fahey about his prior discussions with Ferguson as well as Forest Products' attorneys in the conversion action.[9] With regard to his discussion with Ferguson, Fahey indicated that he did not recall talking about Pattillo but explained that his "attorney * * * was present at the time and our subject was incredibly limited to what we would talk about." With regard to his discussions with Forest Products' attorneys in the conversion action, Fahey said that he had not "really told [those attorneys] anything yet." Instead, Fahey explained:

"I suggested that they get copies of cancelled checks. I suggested that they go to certain vendors and locations and

---

[9] Our understanding is that Ferguson did not represent Forest Products in the conversion action.

get copies of any inventory records they might have. I mentioned that before[,] at the meeting in February [2006]. But up to this point in time[,] I can't give any specific information to them regarding anything."

On May 8, 2006—two days after Newell took Fahey's deposition—trial in this case began. Before Fahey was scheduled to be called as a witness, Coit appeared on his behalf and filed a motion to seal the deposition transcript. There is no indication from the record on appeal that defendants objected to Coit's motion. The hearing that followed was not transcribed for this proceeding. Ultimately, the trial court granted Coit's motion and sealed the deposition transcript; however, the court did not preclude Fahey from testifying at trial.

Thereafter, defendants called Fahey as a witness outside the presence of the jury, and defendants' attorney, Ferguson, asked the following question: "Was there a time within [February 25, 2002 until December 31, 2002,] when you were instructed to remove inventory off the books of Forest Products?" At that point, Coit interjected, "Judge, I'd advise my client to invoke the Fifth Amendment on that question."

A detailed account of the discussion that ensued between Ferguson, Coit, and the trial court would not benefit the bench, bar, or public. It is sufficient to note that defendants' position was that the Fifth Amendment privilege was unavailable to Fahey, because the statute of limitations had run as to the conduct referenced in the question. Coit, however, disagreed that the privilege was necessarily unavailable, particularly in that Fahey had not yet been sentenced for the crimes to which he had pleaded guilty.[10]

---

[10] We note that there appears to be support for Coit's position. *See Mitchell v. United States*, 526 US 314, 316, 119 S Ct 1307, 143 L Ed 2d 424 (1999) (addressing "whether, in the federal criminal system, a guilty plea waives [the Fifth Amendment privilege against self-incrimination] in the sentencing phase of the case, either as a result of the colloquy preceding the plea or by operation of law when the plea is entered"; holding that "the plea is not a waiver of the privilege at sentencing"); *State v. Nelson*, 246 Or 321, 323, 424 P2d 223, *cert den*, 389 US 964 (1967) ("The courts are in agreement that the privilege against self-incrimination is waived where the witness has entered a plea of guilty *and been sentenced* and the examination is directed to eliciting facts concerning the crime of which he was convicted." (Emphasis added.)).

Ultimately, the trial court indicated, "I'm not going to make any findings with regard to statutes of limitation[.]" Ferguson, defendants' attorney, sought clarification after which the following exchange occurred:

"THE COURT: So Mr. Coit's going to advise his client to invoke the Fifth in areas where he's uncomfortable because he doesn't know whether or not the statute has run.

"MR. FERGUSON: *And I'm going to invite you to tell Mr. Coit and Mr. Fahey they don't have a Fifth Amendment right to do that.*

"THE COURT: *And I'm not going to do that. If he invokes his Fifth Amendment, then he's going to invoke his Fifth Amendment, and he won't testify in that area.*

"MR. FERGUSON: Okay. * * *

"THE COURT: So do you want to proceed with that witness or not?

"MR. FERGUSON: No, I am not proceeding with that witness."

(Emphases added.)

Accordingly, Fahey did not testify before the jury. Plaintiffs, however, called Pattillo as a witness during their rebuttal case. Pattillo testified that, in light of the "checks and balances" that were in place at Forest Products, it would have been "virtually impossible" for inventory to come in and then be removed from the books.

On cross-examination, Pattillo testified that he had not had a discussion with Fahey in December 2001 concerning the ability to take funds from Forest Products and that he had been unaware of Fahey's embezzlement. Pattillo further testified that (1) he was responsible for reconciling the inventory as reflected in the computer system with the inventory reflected in the traders' spreadsheets on a monthly basis; (2) there were occasions when he instructed Fahey to make adjustments to inventory; and (3) he usually gave Fahey information concerning where the adjustment needed to be made, which "probably had [his] initial on it."

In sum, as framed by the parties, the jury's determination of the breach of contract claim reduced to a single, fundamental question: Had Greenwood paid for inventory that it did not receive from Forest Products?

Plaintiffs asserted that Schmidt's reconstruction of both companies' books revealed that Greenwood had paid Forest Products for $819,731.68 in inventory that it had not received and that Greenwood's overpayment resulted from Fahey's manipulation of the books to hide his embezzlement from Forest Products. According to plaintiffs, although Fahey was an employee of Greenwood, Fahey's actions were attributable to Forest Products because it had the right to exercise control over his actions. Conversely, for their part, defendants posited that Greenwood's overpayment, if any, was caused by Greenwood's own employees—*viz.*, Fahey and Pattillo—who had performed accounting services for Forest Products under the management and administrative services provision of the APA and whose conduct could not be attributed to Forest Products.[11]

As pertinent here, "the jury returned a verdict in favor of plaintiffs on the breach of contract claim, which included damages in the amount of $819,731.68 for the overpayment of inventory." *Greenwood I*, 238 Or App at 478. "The jury also found in favor of defendants on their counterclaim for nonpayment on the promissory notes in the amount of $1,043,757.00."[12] *Id.*

After the conclusion of the trial in this case, Fahey was sentenced in the criminal action. Subsequently, on May 31, 2006, Fahey executed an affidavit, which defendants submitted in support of their motion for a new trial. In that

---

[11] Defendants also argued that Schmidt's reconstruction of the parties' books was based, in part, on the use of unreliable data from the companies' computer systems.

[12] Thereafter—and after the jury had been discharged—"the parties argued about whether the verdicts were internally inconsistent." *Greenwood II*, 351 Or at 613 n 7. In October 2006, "[t]he trial court ultimately determined that the verdicts were not inconsistent[.]" *Id.* Specifically, the trial court explained that "the jury could have lawfully reached this result based on the evidence presented that Forest Products' accounting errors may have occurred in earlier inventory purchases, and that therefore, the amounts of the promissory notes could have been accurate at the time of execution." Neither party has challenged the trial court's determination.

affidavit, Fahey described in detail Pattillo's conduct in instructing Fahey to remove phantom inventory from Forest Products' books before it was sold to Greenwood—which, in turn, substantiated defendants' fundamental assertion that Greenwood had not, in fact, overpaid for inventory—that is, Greenwood received exactly what it had paid for. Specifically, Fahey averred, in pertinent part:

"4. Sometime between December 2001 and February 2002 I had a memorable lunch with my superior [Pattillo].

"5. At our lunch Pattillo discussed with me the potential of my taking funds from [Forest Products]. Pattillo indicated to me that I could take funds from [Forest Products] accounts and in exchange I would not protest or object to accounting irregularities and/or practices resulting from his orders directing me to make entries into the [Forest Products] accounting system and/or ignore irregular accounting entries into the [Forest Products] accounting system performed by Pattillo.

"6. From February 2002 until December 2002 I proceeded to transfer [Forest Products] funds to my accounts. My method of dispersal required Pattillo to sign off and acknowledge that funds from [Forest Products] were being paid via ACH transfer to my personal accounts.

"* * * * *

"14. I understood that [Greenwood] was subject to public accounting/auditing requirements that required [Forest Products] to make efforts to determine the exact amount of inventory being sold to [Greenwood] by [Forest Products], for every Inventory Sale.

"15. Accordingly, [Greenwood] required a physical count of the inventory to be performed by [Forest Products] prior to * * * each Inventory Sale.

"* * * * *

"17. [Forest Products] utilized Navision Financials ('Navision') as its computer accounting system. Navision contains inventory journals that allow for manual manipulation of inventory levels present on the computer.

"18. For each Inventory Sale a physical count would be performed. If the inventory for the physical count was less than the inventory registered on the computer accounting

system, Pattillo instructed me to remove the excess inventory from Navision, so that the Navision accounting of inventory would match the physical count of inventory.

"19.  My expertise and background in accounting makes it clear to me that the manipulation of inventory that I performed at Pattillo's instruction was not in accordance with regulations governing accounting practices and procedures. There is no accounting justification for the inventory manipulations I performed at the request of Pattillo.

"20.  I was aware that by removing inventory from the Navision accounting system I was doing so in exchange for Pattillo ignoring my transfer of [Forest Products'] funds to my personal account.

"21.  With regard to the improper inventory entries, I have been provided with the Navision database for Forest Products for the period of time in question.

"22.  For each removal of inventory from the Navision accounting system I would label such removal of inventory with the term 'NEGAPP.' It is of note that after December 2002 I ceased making 'NEGAPP' entries into the Navision [s]ystem because by that time Pattillo had been taught by me how to make those entries and no longer needed me to do so.

"23.  'NEGAPP' is the term created by me and refers to the inventory entries made by me at the instruction of Pattillo that resulted in the reduction of [Forest Products'] inventory as reflected on the Navision accounting system.

"24.  Using the Navision system I was able to isolate the NEGAPP entries performed by me by performing [a specified query.]

"* * * * *

25.  The NEGAPP entries also correspond to a particular 'PIP'/Order file for [Forest Products]. Each NEGAPP can be traced to a 'PIP'/Order file by doing [a specified query] in the Navision system[.]

"* * * I was able to determine the PIP/Order files that were associated with each NEGAPP. * * *

"26.  The importance of tracing the NEGAPP to a [Forest Products] order file is that I can then verify the fact that a purchase order for the inventory exists.

"27. By tracing the NEGAPP entries through the Navision accounting system I determined that the NEGAPP entry was applied to PIP/Order files \* \* \*.

"28. Each time there was an Inventory Sale I would have to make several NEGAPP entries at the request of Pattillo prior to the occurrence of the Inventory Sale. After I made these NEGAPP entries I would have Pattillo first approve a draft run of the inventory journal by having him initial my NEGAPP entries on the Navision system. I have not been able to review those documents, but I am aware that Pattillo signed off on all my NEGAPP entries.

"\* \* \* \* \*

"30. By using the Navision system I was also able to determine that even though my NEGAPP entry removed inventory from the [Forest Products] computers, [Forest Products] issued checks for the payment for the 'removed' inventory (i.e. removed by me from the Navision system). I have printed out the [Forest Products] checks issued for inventory removed from Navision through the NEGAPP entry. \* \* \*

"31. These checks reflect that even though I was told to remove the inventory via a NEGAPP entry, a check was issued for payment by [Forest Products] to the particular supplier owed for the purchase of inventory by [Forest Products].

"\* \* \* \* \*

"33. I am also aware that [Forest Products] used an 'Access Database,' a Microsoft program to track the inventory movements of the 'XL' (extended life program) program after purchase. I have never had any ability to make entries of any kind into the 'Access Database,' but Pattillo did have the ability to make entries into the 'Access Database.'"

In sum, the averments of Fahey's affidavit, if believed, established the following: After the closing date of the APA in February 2002, Pattillo (1) directed Fahey to manually manipulate inventory in Forest Products' computer system in a way that "was not in accordance with regulations governing accounting practices and procedures" and (2) gave Fahey documents "sign[ing] off" on those inventory manipulations. Because Greenwood was subject to public accounting and auditing requirements, a physical count was required

before a unit of inventory was sold to Greenwood. *See* 264 Or App at 3-4 (describing selling of inventory units). When the physical count was less than the inventory reflected in the computer system, Pattillo instructed Fahey to remove the excess inventory from the system. Moreover, based on Fahey's review of the system itself, he described the specific search queries that could be used to isolate entries resulting in the removal of inventory and substantiated that Forest Products issued checks to suppliers for the inventory that had been removed. Forest Products used a different computer database to track what occurred after the issuance of the checks, and Pattillo—not Fahey—had the ability to make entries into that database.

After Fahey executed his affidavit—but before defendants filed their motion for new trial—the court "decided plaintiffs' equitable claims [for rescission and reformation of the notes] in defendants' favor and entered a judgment awarding damages according to the jury's verdicts." *Greenwood II*, 351 Or at 613. The court, by order, also unsealed Fahey's deposition transcript.

Defendants filed a motion for a new trial under ORCP 64 B, raising a variety of grounds. As pertinent here, defendants sought a new trial under ORCP 64 B(4), relying primarily on Fahey's affidavit as newly discovered evidence that warranted a new trial under the rule. Specifically, defendants contended that "most of the information" in Fahey's affidavit "was neither discussed nor disclosed in his deposition." In particular, unlike Fahey's deposition testimony, his affidavit "specifically identif[ied], on a step-by-step basis, exactly how manipulation of the inventory occurred" at Pattillo's instruction. Defendants explained that, although "it was generally known" to Ferguson that Pattillo had knowledge of Fahey's embezzlement, "the exact method of how this was accomplished, and the resulting manipulation of the inventory, was neither known nor capable of discovery." According to defendants, the jury's consideration of Fahey's affidavit "would have significant effect."

During the hearing on defendants' motion, the trial court indicated that, to obtain a new trial, defendants had "a

pretty heavy standard burden that [it] need[ed] to meet" and that defendants "[had not] met that burden." Nevertheless, the trial court did not enter a timely order denying defendants' motion for a new trial, and, as a result, the motion was deemed denied. *See* ORCP 64 F(1) (so providing).

Thereafter, the trial court entered a supplemental judgment awarding plaintiffs their attorney fees on the breach of contract claim and awarding defendants their attorney fees on the counterclaim for nonpayment of the promissory notes. However, the court denied defendants their claimed expert expenses.

Defendants appealed the general judgment and the supplemental judgment for attorney fees, raising seven assignments of error. Plaintiffs cross-appealed.

On appeal, we concluded that defendants were entitled to a directed verdict on plaintiffs' breach of contract claim. *Greenwood I*, 238 Or App at 480-82. Our disposition obviated the need to consider defendants' third through sixth assignments of error. *Id.* at 482. However, we addressed defendants' seventh and final assignment of error pertaining to the trial court's supplemental judgment. *Id.* at 482-85. Given our reversal of the judgment on the breach of contract claim, we reversed the trial court's award of attorney fees to plaintiffs on that claim and remanded for a determination of defendants' entitlement to fees. *Id.* at 482-83. We also concluded that defendants—who were awarded attorney fees as the prevailing party on their counterclaim for nonpayment of the promissory notes—were also entitled to recover expert expenses and remanded for the trial court to award reasonable expert expenses to defendants. *Id.* at 482-85. Finally, because it had not been preserved, we rejected plaintiffs' sole contention on cross-appeal concerning the trial court's denial of plaintiffs' claim for rescission as to the promissory note issued in June 2003. *Id.* at 485-86.

On review, the Supreme Court held that "the trial court in this case properly rejected each of the grounds that defendants raised at trial for granting their motion for a directed verdict on plaintiffs' breach of contract claim." *Greenwood II*, 351 Or at 620. As a result, the Supreme Court

reversed our decision to the contrary and remanded for us to consider the following assignments of error that had been obviated by our disposition or that we needed to readdress because our decision had been predicated on defendants' entitlement to a directed verdict: (1) defendants' fifth assignment of error concerning purported instructional error; (2) defendants' sixth assignment of error concerning the denial of their new trial motion; and (3) the part of defendants' seventh assignment of error concerning the award of attorney fees to plaintiffs on their breach of contract claim.[13]

For the reasons that follow, we agree with defendants that they are entitled to a new trial on plaintiffs' breach of contract claim. That disposition again requires the reversal of the attorney fee award for plaintiffs and obviates the need to consider defendants' assignment of error concerning purported instructional error.[14] Accordingly, we turn to the dispositive issue on remand: defendants' entitlement to a new trial on plaintiffs' breach of contract claim.

As before the trial court, relying primarily on Fahey's post-trial affidavit, defendants contend that the trial court abused its discretion in denying a new trial on the breach of contract claim, because that newly discovered evidence "disclosed [Pattillo's] involvement in embezzlement." Defendants explain that the affidavit gave a "very different" and "thorough explanation of the accounting errors and

---

[13] We note that, in *Greenwood I*, we concluded that defendants, as the prevailing party on their counterclaim for nonpayment of the promissory notes, were entitled to recover reasonable expert expenses, 238 Or App at 482-85, and rejected plaintiffs' cross-appeal in which their sole contention was that the trial court erred in denying plaintiffs' claim for rescission as to one of the notes, *id.* at 485-86. Plaintiffs did not challenge those two determinations in the Supreme Court. *Greenwood II*, 351 Or at 615 n 8. For that reason, we adhere to our reasoning in *Greenwood I* concerning those determinations and readopt it here.

[14] Although the Supreme Court remanded this assignment of error to us, the court strongly indicated its resolution:

"It strikes us that the * * * claim of error[—*viz.*, that the trial court erred in instructing the jury as to the 'loaned servant doctrine' because there was no evidence to support it—]may be resolved by our conclusion that 'plaintiffs' evidence about the divided responsibilities of Greenwood employees and the continuing right of control of Forest Products' principals was sufficient to create a jury question.' 351 Or at 617. However, we leave it to the Court of Appeals to make that determination."

*Greenwood II*, 351 Or at 621 n 13.

how those may not have implicated at all the accuracy of the inventory transferred to and paid for by Greenwood." According to defendants, in light of that evidence, "[t]he jury would have understood that there may well have been no inaccuracy at all with the inventory amounts transferred between the companies (this was plaintiffs' allegation of how defendants[] breached the contract)" and "probably would have changed the outcome."[15]

Plaintiffs remonstrate that the trial court's denial of the motion should be sustained for either of two primary alternative substantive reasons. First, the evidence was not "newly discovered" in that (according to plaintiffs) defendants failed to exercise reasonable diligence in acquiring and producing that evidence at trial. Second, defendants failed to demonstrate that the new evidence would probably change the result if a new trial is granted. With respect to the latter, plaintiffs emphasize both that defendants presented other evidence at trial in support of their contention that Greenwood had, in fact, received what it had paid for (and, thus, had not overpaid)—and that the jury, by necessary implication, had not credited that evidence.[16]

---

[15] Defendants also contend that Fahey's affidavit demonstrates that Greenwood—*viz.*, their vice president Pattillo—directed Fahey's activities such that Forest Products was not responsible for any losses.

[16] Plaintiffs also raise a procedural objection, *viz.*, that the denial of defendants' new trial motion is unreviewable because, as a practical matter, the asserted "newly discovered" evidence could have been presented at trial but for the trial court's ruling, which effectively sustained Fahey's invocation of the Fifth Amendment privilege at trial—and defendants have not assigned error to *that* ruling. That failure, plaintiffs posit, is procedurally preclusive. *See, e.g., Sansone v. Garvey, Schubert & Barer*, 188 Or App 206, 226-27, 71 P3d 124, *rev den*, 336 Or 16 (2003) (involving a request for a new trial because of attorney misconduct to which no objection had been made during trial; reasoning that "[t]he general rule is that the denial of a motion for a new trial is not reviewable on appeal when the motion is based on alleged errors committed during the trial" and that "it is incumbent on a party to make a proper objection during trial and to assign error to the ruling on that objection").

Plaintiffs' contention is unavailing for two interrelated reasons. First, defendants' motion for a new trial is predicated on, as pertinent here, newly discovered evidence and not on some purported legal error at trial (as contemplated in *Sansone*). Second, the gravamen of defendants' appellate challenge to the denial of their new trial motion does not partake of a belated collateral attack on the trial court's ruling as to the privilege but, instead, presumes the correctness of that ruling—a presumption, which, as noted, appears to be well founded. *See* 264 Or App at 9 n 10. Thus, we agree with defendants that they have "no obligation to

Pursuant to ORCP 64 B,

"[a] former judgment may be set aside and a new trial granted in an action where there has been a trial by jury on the motion of the party aggrieved for any of the following causes materially affecting the substantial rights of such party:

"\* \* \* \* \*

"B(4) Newly discovered evidence, material for the party making the application, which such party could not with reasonable diligence have discovered and produced at the trial."

In *State v. Arnold*, 320 Or 111, 120-21, 879 P2d 1272 (1994), the Supreme Court held that, to justify a new trial under ORCP 64 B(4), newly discovered evidence must meet the following six requirements:

"(1)   It must be such as will probably change the result if a new trial is granted;

"(2)   It must be such as, with reasonable diligence, could not have been discovered before or during the trial;

"(3)   It must be such that it cannot, with reasonable diligence, be used during trial;

"(4)   It must be material to an issue;

"(5)   It must not be merely cumulative; [and]

"(6)   It must not be merely impeaching or contradicting of former evidence."

(Footnote omitted.) Although "[t]he first three requirements are independently essential," the last three "are closely related to the first." *State v. Acree*, 205 Or App 328, 334, 134 P3d 1069 (2006).

When a trial court denies a new trial motion, "[a]ssuming that the trial court made no predicate legal error, we review the court's decision for an abuse of discretion." *Id.* at 330. However, as we explained in *Mitchell v. Mt. Hood Meadows Oreg.*, 195 Or App 431, 457, 99 P3d 748 (2004),

---

mount a fruitless constitutional argument" in order to pursue and obtain review of their claim to a new trial.

"the determination of whether the requirements of ORCP 64 B(4) are met is not the kind of decision that involves more than one legally permissible choice to be made by the trial court. *See State v. Rogers*, 330 Or 282, 312, 4 P3d 1261 (2000) ('If there is only one legally correct outcome, then "discretion" is an inapplicable concept.'). Rather, *Arnold* teaches us that the decision to be made by the court under ORCP 64 B(4) is initially a legal determination about the adequacy of the movant's grounds for a new trial."

As previously explained, 264 Or App at 15-16, defendants' new trial motion was ultimately deemed denied because the court did not enter a timely order resolving it. Thus, the issue in this case is a legal one—that is, whether the requirements of ORCP 64 B(4) have been satisfied.

We agree with defendants that the requirements of ORCP 64 B(4) have been satisfied in this case. That is so for three salient reasons.

*First*, even though defendants' motion relied, in part, on the deposition transcript, the primary basis of the motion was Fahey's post-trial affidavit, which presented qualitatively different information than did the deposition transcript. During his deposition, Fahey described, in general terms, his thesis concerning Pattillo's inventory manipulation scheme involving the removal of phantom inventory from Forest Products' books and written communications to Fahey confirming Pattillo's instructions to remove such inventory. However, it was not until Fahey executed the affidavit—based on his review of the Navision database—that defendants had (1) evidence of the specific database coding and search queries that demonstrated *how* the removal of phantom inventory occurred and (2) evidence of the specific transactions for which checks were issued for the removed inventory. Thus, in determining whether defendants are entitled to a new trial, the proper focus is on Fahey's affidavit, not the deposition transcript.

*Second*, and notwithstanding plaintiffs' contentions to the contrary, defendants "could not with reasonable diligence have discovered and produced the evidence [contained in Fahey's affidavit] at the trial." *Arnold*, 320 Or at 120. In his affidavit in support of the new trial motion, Ferguson

averred that, before trial, he had "had the occasion to have conversations with [Fahey] in the presence of his criminal attorney" and that "[s]ubstantial limitations were placed upon the questions [he] was able to ask [Fahey] by his criminal attorney, as a result of the then pending criminal charges." Further, Ferguson averred that, at the time of trial, "a significant amount of information" in Fahey's affidavit "was not know[n] to [him]" and that he did not believe that he "would have been permitted to inquire into the subject matter during [his] various conversations with [Fahey], because [of Fahey's] pending criminal prosecution."

With respect to reasonable diligence, we begin by noting that Ferguson's averments are consistent with Fahey's deposition testimony about the limitations that Coit placed on Fahey's pretrial discussions with Ferguson and Forest Products' attorneys in the conversion action described above, 264 Or App at 8-9.[17] Perhaps ironically, but for plaintiffs' unethical procurement of Fahey's deposition, defendants would not have discovered information about Fahey's thesis concerning Pattillo's purported inventory manipulation. Further, Coit's successful efforts at the time of trial in this case to seal Fahey's deposition testimony—which was unethically procured by *plaintiffs* and which appears to be what alerted defendants to Fahey's thesis concerning Pattillo's inventory manipulation scheme—demonstrate that Coit would not have permitted defendants to inquire into this subject matter either before or during trial. Indeed, when defendants called Fahey as a witness at trial outside the presence of the jury and attempted to inquire about Pattillo's purported inventory manipulation, Coit advised Fahey to assert his Fifth Amendment privilege—and, notwithstanding defendants' protests, the trial court effectively precluded defendants from eliciting testimony from Fahey about that manipulation. In sum, under the totality of the circumstances in this case, defendants, in the exercise of reasonable diligence, could not have discovered and presented Fahey's putative testimony, which, as set out in his

---

[17] Although, as part of his plea agreement, Fahey had agreed to cooperate with Forest Products' efforts to locate missing assets, Coit intentionally and significantly limited the subject matter and particular information that Fahey provided Ferguson and Forest Products' attorneys in the conversion action.

post-trial affidavit, coherently and precisely detailed and substantiated *how* Pattillo's manipulation occurred in a way that did not result in Greenwood's overpaying for the inventory that it received from Forest Products.

*Third*, that new evidence is qualitatively of the sort that, if believed, "will probably change the result." *Arnold*, 320 Or at 120. That is, the evidence of Pattillo's scheme of directing the manipulation of "phantom inventory" as presented in the post-trial affidavit—evidence which, if believed, demonstrated that Greenwood had not overpaid Forest Products for inventory or at least substantially subverted plaintiffs' evidence to the contrary—is just the type of evidence that, if believed, "would probably lead a reasonable person to a different decision from that reached by the jury." *Acree*, 205 Or App at 337. That is so, not the least, because Fahey's conduct, the direction and oversight of that conduct, and the evidence of the "reconstructed" inventory entries on which plaintiffs' claims were based, were central to this dispute. It is especially telling that, once Fahey's trial testimony had been precluded, plaintiffs, in their rebuttal case, called Pattillo to elicit testimony ostensibly refuting any possibility of the manipulation of phantom inventory.

In *Acree*, we noted that "there inheres in the words 'will probably' an internal tension" in that "[t]he word 'will' connotes certainty, whereas 'probably' ordinarily means that a particular result is more likely than not to occur." 205 Or App at 334-35. Nonetheless, we concluded that "will probably" reflects a "probability" standard. *Id*. at 335. That conclusion was informed by the Supreme Court's prior observation that the party seeking a new trial bears the burden of showing a "state of undisputed facts."[18] *Id*. (internal quotation marks omitted). Nevertheless, in *Acree*, we reversed the trial court's denial of a new trial motion based on videotaped evidence that directly rebutted the state's theory that

---

[18] In *State v. Farmer*, 210 Or App 625, 641-42, 643, 152 P3d 904, *rev den*, 342 Or 645 (2007), we acknowledged that the meaning of that phrase was unclear and declined to clarify it. However, we aptly observed that, "[i]f newly discovered evidence has to create an undisputed state of facts, it could almost never be grounds for a new trial: if it conflicted with the existing evidence, it would not be undisputed, but if it did *not* conflict with the existing evidence, it typically would be cumulative." *Id*. at 642 (emphasis in original).

the defendant constructively possessed the drug-related evidence and contradicted one of the state's primary witnesses. In doing so, we explained that the new evidence "would have substantially undermined the state's [constructive possession] theory" and that, once the accuracy of the state's witness's testimony "was called into question, the jury may have been more likely to credit [other testimony] that [the] defendant did not know that any drug paraphernalia was present in the house." *Id.* at 337; *see also State v. Farmer*, 210 Or App 625, 643, 152 P3d 904, *rev den*, 342 Or 645 (2007) (noting that, in some cases, our assessment of whether newly discovered evidence will probably change the result "necessarily [has been] based not on a prediction that the jury will believe the evidence but rather on an assessment that the evidence could be believed by a reasonable jury and, if so, would probably change the result").

Here, again, the evidence in Fahey's affidavit was material to the fundamental question at the core of this case: Did Greenwood pay Forest Products for inventory that Greenwood did not receive? As noted above, 264 Or App at 11 n 12, the jury's answer to that question was different depending on the time period involved—that is, as to the earlier inventory purchases, the jury found that there was an overpayment (which was reflected in the verdict in favor of plaintiffs on the breach of contract claim), but, as to the final purchase reflected in the promissory notes, the jury found that there was no overpayment (which was reflected in the verdict in favor of defendants on their claim for non-payment of the notes).

At the least, the evidence in Fahey's post-trial affidavit would have contradicted Pattillo's rebuttal testimony concerning the impossibility of someone removing inventory from Forest Products' books—and, concomitantly, would have corroborated defendants' evidence that the amounts of the final inventory purchases were accurately reflected in the notes. But even more importantly, given the jury's verdict for plaintiffs on the breach of contract claim, Fahey's affidavit directly rebutted plaintiffs' theory that Schmidt's reconstruction demonstrated that Greenwood overpaid for inventory as a result of Fahey's manipulation of the books to hide his own embezzlement from Forest Products and

substantiated, in detail, the actions that Fahey took at Pattillo's direction beginning after the February 28, 2002, closing date of the APA—that is, actions that would have related to the breach of contract claim. If the accuracy of plaintiffs' theory were called into question with the contrary evidence in Fahey's affidavit about how inventory was manipulated in the Navision system without causing Greenwood to pay for inventory that it did not receive, the jury "may have been more likely to credit" other testimony supporting defendants' theory that Greenwood had not paid Forest Products for inventory that Greenwood did not receive.[19] *Acree*, 205 Or App at 337.

Thus, we agree with defendants that the evidence in Fahey's affidavit was "[n]ewly discovered evidence, material for [defendants], which [they] could not with reasonable diligence have discovered and produced at trial." ORCP 64 B(4). Accordingly, defendants are entitled to a new trial on plaintiffs' breach of contract claim.

Given that disposition of defendants' sixth assignment of error, we turn to defendants' seventh assignment of error pertaining to the supplemental judgment. In light of our conclusion that defendants are entitled to a new trial on the breach of contract claim, the attorney fee award to plaintiffs on that claim must be reversed. ORS 20.220(3)(a) (providing that, when a party appeals a judgment to which an award of attorney fees relates, "[i]f the appellate court reverses the judgment, the award of attorney fees or costs and disbursements shall be deemed reversed").

In sum, on remand, we conclude that defendants are entitled to a new trial on plaintiffs' breach of contract claim under ORCP 64 B(4) and, as a consequence, the award of attorney fees to plaintiffs on that claim must be reversed.

---

[19] To be sure, as plaintiffs point out, the fact that Fahey was a "felon[,] convicted of a crime of dishonesty," could well bear on the assessment of his credibility in a new trial. Nevertheless, Fahey's putative testimony is extremely detailed, particularly with respect to the documentation of inventory manipulations Pattillo allegedly directed, and is at least ostensibly internally consistent—and a trier of fact could certainly determine that, in the totality of the circumstances, Fahey would be motivated to tell the truth rather than to lie under oath and consequently incur further penal consequences. Thus, and contrary to plaintiffs' assertion, the new evidence is *not* "simply too unbelievable to change the result if a new trial were granted." *Farmer*, 210 Or App at 643.

Our disposition obviates the need to consider defendants' assignment of error on appeal concerning purported instructional error. Further, as explained above, 264 Or App at 17 n 13, we adhere to and readopt our reasoning in *Greenwood I*, concerning defendants' entitlement to recover reasonable expert expenses as the prevailing party on their counterclaim for nonpayment of the promissory notes, 238 Or App at 482-85, and rejecting plaintiffs' cross-appeal, *id.* at 485-86.

On appeal, (1) general judgment on plaintiffs' claim for breach of contract reversed and remanded; otherwise affirmed; (2) plaintiffs' attorney fee award in supplemental judgment on breach of contract claim reversed and remanded; (3) defendants' attorney fee award in supplemental judgment on counterclaim for nonpayment of promissory notes remanded for the court to award reasonable expert expenses to defendants. On cross-appeal, affirmed.